**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**UNITED PARCEL SERVICE, INC., Respondent.**

No. 6075.

United States Court of Appeals First Circuit.

Heard May 6, 1963.

Decided June 4, 1963.

Elliott Moore, Washington, D. C., with whom Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Gary Green, Washington, D. C., were on brief, for petitioner.

Vernon C. Stoneman, Boston, Mass., with whom Alan S. Miller and Stoneman & Chandler, Boston, Mass., were on brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

HARTIGAN, Circuit Judge.

This is a petition of the National Labor Relations Board for enforcement of its order issued against respondent on March 30, 1962, following the usual proceedings under the Act. The Board, in adopting the opinion of its trial examiner, found that the respondent had discriminated with respect to the hire and tenure of one of its employees in violation of Section 8(a) (3) of the Act and had violated Section 8(a) (1) by interrogating this same employee. The issue here is whether substantial evidence on the record considered as a whole supports the Board's findings.

The pertinent facts may be briefly stated. Respondent operates a national parcel delivery service. In March 1960, it opened a new facility in Providence, Rhode Island, under the supervision of Michael J. Fitzgerald. At the very outset of the establishment of the Providence branch, the company agreed to recognize the Union.[1] The act of immediate Union recognition was consonant with the respondent's uniform nationwide

---

1. International Brotherhood of Teamsters, Warehousemen and Helpers of America, Local 251.

policy.[2]  Respondent also orally authorized the checkoff of Union dues from all employees, recognized one of the employees as the Union steward, following his appointment by the Union's business agent, and by May 1960, further required employees to become Union members within thirty days of their employment.

The record indicates that the respondent strives for a considerable selectivity in the employment of its parcel delivery drivers and utilizes scientific personnel recruitment techniques to achieve this end.  Its reason is that it offers a highly specialized type of service.  As part of this program, respondent regularly administers a written intelligence test to each delivery driver applicant.  One of these tests is the so-called "Wonderlic" test.  Under this examination, each applicant receives a raw score based on the number of correct answers out of a total of fifty questions.[3]  This raw score is thereafter converted by means of a table to a range between one and twenty.  The record indicates that it was the policy of the company to restrict its hiring of parcel delivery drivers to those achieving a score of ten or more on the test, although its minimum score for these drivers is eight.  For an employee to be considered for advancement to supervisory status, he must have received a score of twelve on the test.  While these were the desired criteria, there was testimony that in special cases the respondent had permitted deviations from these norms.

Vincent J. Guertin was one of the parcel delivery drivers hired by respondent during the initial staffing of its Rhode Island operation in March, 1960.  He was a member of the Union and was referred to the respondent by the Union's business agent.  Guertin was hired by Fitzgerald—respondent's local manager—despite the fact that he only achieved a score of six on the personnel test.  It is uncontradicted that this was the lowest score of any delivery driver employee that the company had hired in Rhode Island.  At the hearing respondent explained its action of hiring Guertin—despite his low score—on the basis that most of the applicants referred to respondent by the Union during the initial organizational stage were highly unsatisfactory.  However, to avoid any appearance of apparent Union discrimination, the respondent resolved to hire a few of the more "presentable" candidates, despite the demonstrably marginal status of their qualifications, as evidenced by the personnel test score.  Guertin was one of the individuals thus hired.

Thereafter Guertin remained with respondent until he was discharged on May 26, 1961.  There is no question that he was a satisfactory employee in all respects, a point evidenced by the fact that from time to time he was selected by respondent to train new delivery drivers.  The reason why he was discharged presents the pivotal issue in this case.

It is respondent's position that in a routine review of personnel files, Guertin's extremely low score on the Wonderlic test had come to the attention of respondent's district operations manager —one Edward Polusky.  Thereafter, over the course of his employment, Guertin's presence was apparently a source of continuing concern to Polusky and he brought the matter to the attention of Fitzgerald on at least two occasions.

Meanwhile, Guertin while performing satisfactorily as a delivery driver, had repeatedly begun to inquire of Fitzgerald as to how he might obtain supervisory status with the respondent.  When Fitzgerald informed Polusky of this fact, he—in the light of company policy—determined that an employee who had scored a mere six on the personnel test would never be promoted to supervision with respondent.  Consequently, according to Polusky, to avert Guertin's "frus-

---

**2.**  There was uncontradicted evidence that all of respondent's some 10,000 drivers was unionized—the vast majority of them members of the Teamsters—and that this was in accord with respondent's policy over the course of the past twenty years.

**3.**  The test is of twelve minutes duration.

tration" and its residual effects on employee morale, he deemed it prudent to discharge Guertin forthwith and thus nip, in its incipiency, a potentially undesirable employer-employee relationship. Thereafter, on May 26, 1961 Guertin was discharged, despite record testimony that Fitzgerald argued against this action, in view of Guertin's entirely satisfactory performance record. Guertin was informed that his low score on the personnel test was the sole reason for his discharge and this has been the respondent's consistent position throughout the present proceedings.

The Board, on the other hand, found that respondent's reliance on Guertin's low test score and its prospective restrictive impact on his aspirations for advancement with respondent were mere pretexts—adduced simply to put a gloss on the respondent's real motive for the discharge. Under the Board's view, the real motive was the company's desire to rid itself of an active and articulate union spokesman who—as characterized by the Board—was constantly galvanizing his fellow workers on to more strident Union activity. Again, in the Board's view, while the company "recognized" the Union, the relationship between Union and company was a "quiescent" one whose blandness was in jeopardy if Guertin remained as an employee.

Whatever, as an abstract proposition, we might think of the wisdom or the "business judgment" of discharging an employee because of his low score on a twelve minute aptitude test—some fourteen months after the event—and indeed after the employee has in the day-to-day operation of the company's business proven himself satisfactory, nonetheless we must respect the right of a company to make just such a decision. Cf., N. L. R. B. v. New England Web, Inc., 309 F. 2d 696 (1st Cir. 1962); National Labor Rel. Bd. v. Houston Chronicle Pub. Co., 211 F.2d 848, 855 (5th Cir. 1954).

■ It is elemental that a company may discharge an employee for a good reason, a bad reason or indeed for no reason at all. And it is not for the courts to interfere with the unfettered right of companies to exercise these personnel judgments. There is only one instance when a court may validly move into this area and reverse the action of the employer and that instance is when the discharge is motivated—exclusively or substantially—by anti-union animus.

■ We have reviewed this record in detail and we cannot conscientiously find the slightest trace of hostility either towards the Union as a body or towards Guertin as an individual.

■ It is not necessary to recount the instances upon which the Board relies to support its finding of supposed anti-union animus *vis a vis* the respondent and Guertin. Suffice it to say that they are little more than a multiplication of minutiae whose cumulative impact can in no sense be regarded as substantial evidence on the record considered as a whole. National Labor Relations Board v. Walton Mfg. Co., 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962).

From all that appears in this record, nowhere in its general operations nor in its specific relations with Guertin—is the respondent open to the charge of discrimination because of Union activity. Perhaps the essence of this case can best be summarized in the words of Hylek—the Union business agent—who testified thusly at the hearing, in response to whether he felt that respondent was anti-union:

"A. No, I wouldn't say they were anti-union, but they wanted every 't' crossed and every 'i' dotted, but no reason at all. They seemed to fire people, I mean, they had to be right up there to the letter 't'. If they weren't up there to the letter 't', why, all you knew, they were out in the cold."

Again, all that appears from this record is a decision by the respondent that an employee who scored a six on an employment aptitude test was not "up to the letter t." Although it is perhaps lamentable that it took fourteen months for

this judgment to crystallize, more than this is required before the discharge can be laid at the door of union hostility.

A decree will be entered setting aside the order of the Board.