**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOWELL SUN PUBLISHING COMPANY, Respondent.**

No. 6030.

United States Court of Appeals First Circuit.

Heard March 4, 1963.

Decided June 11, 1963.

---

HARTIGAN, Circuit Judge.

This is a petition of the National Labor Relations Board for enforcement of its order issued on March 12, 1962, against respondent, Lowell Sun Publishing Company, following the usual proceedings under the Act. The Board, in adopting the opinion of its trial examiner found that respondent violated Section 8(a) (1) of the Act by interrogating and threatening an employee concerning his Union activity and by increasing the salary of another employee upon the latter's assurance that he would not support the Union. The Board further found that respondent violated Section 8(a) (3) and (1) by discriminating in regard to the tenure and terms of employment of certain of its employees. The evidence upon which the Board's findings are based may be summarized as follows.

Respondent is engaged in the publication of a daily and Sunday newspaper in Lowell, Massachusetts. In January 1961 the Union [1] began an organizational campaign among respondent's employees and on January 15 conducted an organizational meeting. Shortly after these initial organizational efforts the events which form the basis of the instant charges took place.

I.

*Events relating to employee Dudley.*

One Fred W. Dudley had been employed by respondent since 1934 and became a member of the reportorial staff in 1943. Dudley signed an application card to join the Union on January 4, 1961, and thereafter actively solicited support for the Union among respondent's employees. He was a member of the Union's organizing committee and known as such to respondent. During the week of January 23, Charles Harrington, editor of respondent's Sunday edition (and concededly a "supervisor" within the meaning of the Act) had a conversation with Dudley. Harrington asked Dudley how he "felt about the guild," to which Dudley responded that he "was for it 100 percent." Harrington then said that the Union had

Warren M. Davison, Atty., N. L. R. B., Washington, D. C., with whom Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Harold B. Shore, Atty., N. L. R. B., Washington, D. C., were on brief, for petitioner.

Robert H. Goldman, Lowell, Mass., with whom Frank Goldman and Goldman, Goldman & Curtis, Lowell, Mass., were on brief, for respondent.

Before HARTIGAN and ALDRICH, Circuit Judges, and GIGNOUX, District Judge.

---

1. Newspaper Guild of Greater Boston, Local 32, American Newspaper Guild, AFL-CIO.

attempted to organize respondent's employees some years earlier and that "it threw [him] back five years." He then suggested that Dudley remove his name from the list of Union organizers and become a "secret member." However, Dudley replied that he had signed with the Union and would "stick with it." During the course of this conversation concerning the Union, Harrington also mentioned that "someone could be hurt."

On February 4, without prior notice and apparently without explanation, Dudley was notified by Harrington of his transfer from the Sunday paper to an assignment as Dracut County Reporter. Dudley remained on this daytime assignment until February 19, when City Editor Woodies told him that, effective the next day, he was being transferred to the night shift and ordered him to report at 11:30 p. m.

## II.

### Events relating to employee Francis F. Breen, Jr.

Breen was employed as a sports writer by respondent in July 1948 and served continuously in that capacity, except for a period of military service, until discharged by respondent on March 20, 1961. His professional progress with the paper was apparently steady though unspectacular, and he was selected for several specialized assignments including that of respondent's television critic. In May 1958 Breen applied for and was given the assignment of Dracut County correspondent and in April 1960 he was given the additional assignment of writing a sports column. At this time he was given a $10 weekly pay increase.

On January 11, 1961, Breen signed a Union card, attended the meeting of January 15 and became known to respondent as a member of the Union organizing committee. The record indicates that he was an active Union booster among his coworkers.

On or about January 23, County Editor Killeen informed Breen that on orders from Managing Editor Connors, Breen was being replaced as Dracut County cor-

respondent. When Breen inquired as to the reason, Killeen replied that Connors had mentioned "Complaints about [his] coverage of the Dracut news." The trial examiner credited Breen's testimony that he had received only one complaint from Connors relative to his coverage of the Dracut County news and that this had occurred one and one-half years earlier, in the summer of 1959.

The events leading up to Breen's ultimate discharge from the paper were as follows. On Saturday morning, March 11, Breen was assigned the duties of "desk man" in the sports department. Although the precise duties of a desk man and his responsibilities are somewhat in dispute, it is apparently the desk man's function to edit local and wire copy, to write headlines and to aid in the completion of the layout work prior to the copy going to the composing room. Once the first edition of the paper has been printed (at about noon), it is the desk man's duty to check the sports section of that edition for typographical errors, so that they might be corrected in the following edition. On March 11, Breen apparently performed most of his pre-printing duties and brought the copy to the composing room. Shortly thereafter, at about 9:45 a. m., he informed a fellow sports writer—Owen Flynn—who was also working in the sports department on the morning of the 11th, that he was leaving the paper early to attend a town meeting in Dracut. He requested Flynn to proofread the first edition for him, which Flynn did.

Breen attended the town meeting on March 11. This meeting was continued until the next Saturday, March 18—a fact duly noted in the respondent's paper. Moreover, in the issue of Tuesday, March 14, Breen's sports column carried an extensive report on the March 11th Dracut town meeting. Shortly thereafter Breen received a memo from one of the respondent's owners to the effect that Breen should restrict his sports column to sports.

On Saturday, March 18, Breen was again assigned to the job of desk man

in the sports department. Breen followed the same pattern as that of the preceding Saturday, leaving his post early, at approximately 9:45 a. m., after again asking Flynn to fill in for him. He told Flynn that he was going to the Dracut town meeting which, as noted previously, had been continued from the preceding week. Flynn told Breen that he thought he was "sticking his neck out." Breen "shrugged it off" with a vile and obscene remark and left for the town meeting.

At about 10:30 that morning, managing editor Connors called and asked for Breen. Flynn replied that he was not there, and that he (Flynn) did not know where he was or whether he was going to return that day. In fact Breen did not return to the office during the remainder of the day. At the hearing Connors testified that he knew that the Dracut town meeting had been adjourned to March 18th and that he had a suspicion that Breen might have gone there.

The following Monday, March 20, Breen was called into Connors' office. In response to Connors' questions, Breen stated that he had left the office early the previous Saturday, leaving Flynn to check the paper at noon. Connors then stated that Breen was discharged for "dereliction of duty."

### III.

#### Events relating to employee Weisberg.

During the week of July 10, one Samuel Weisberg, another of the employees who had identified himself as a member of the Union organizing committee during the previous January, was called into the office of Connors to get his paycheck. Weisberg was asked if he "was on [Connors'] side," to which he replied in the affirmative. Connors then said "You'll get a raise next week." The following Tuesday he received a $10.00 pay increase.

Based on the foregoing facts, the Board found that respondent violated Section 8(a) (1) of the Act by interrogating Dudley concerning his Union membership and by threatening him with reprisals therefor, and by granting a wage increase to Weisberg in order to dissuade him from supporting the Union. The Board further found that respondent violated Section 8(a) (3) and (1) of the Act by transferring Dudley because of his Union membership, to a less desirable work shift than he had previously enjoyed, by discriminatorily providing Breen with less employment than he would normally have had, and by discriminatorily discharging Breen on March 20, 1961.

At the outset, as the trial examiner pointed out, there is evidence in the record which indicates that respondent was opposed to the entry of the Union into the plant. Following the organizational meeting of the workers, twenty-six employees of the respondent designating themselves as "members of the committee to organize a Lowell Sun Unit of the Newspaper Guild of Greater Boston, AFL-CIO", on three separate occasions sent telegrams to Frank A. Lawlor, general manager of respondent asking that representatives of the Guild be given an oportunity to negotiate salary adjustments with respondent. Respondent made no reply to these telegrams but did put a photostatic copy of one of the telegrams on a bulletin board, together with a memorandum initialed by Lawlor. The memorandum stated that Lawlor had "no desire, inclination, or present intention to have any discussion with any other than fellow workers." Thereafter, a notice was posted on respondent's editorial room bulletin board, bearing Lawlor's signature, in which he cautioned the workers, *inter alia,* that they would gain more by independent action than by "believing that strangers from outside the city would do much more for them than 'share' their wages through dues and assessments * * * and that there is no need for any individual or any group to submit themselves to enslavement by out-of-towners to bring before management any grievance or suggestions. * * *" This latter memorandum closed with the caveat to the employees that " 'The devil

you know is better than the devil you don't know.' Think!"

While respondent's supervisors were plainly within their rights in thus articulating their views, their utterances do lend a significance to otherwise ambiguous events when the question is whether a given course of conduct was actuated by an anti-union animus.

Respondent contends that the colloquy between Harrington and Dudley should not be regarded as coercion or interrogation but simply as a paternalistic word of caution. The question is a close one and involves drawing competing inferences. However, so long as substantial evidence supports the Board's findings, we adhere to our view that the drawing of inferences "is a matter best left to the Board with its vast experience in dealing with labor disputes. Such inferences, if reasonable, are not to be set aside by the court." Editorial "El Imparcial," Inc. v. N. L. R. B., 278 F.2d 184, 187 (1st Cir., 1960). We cannot say that the Board's conclusion that Harrington's conduct violated Section 8(a) (1) was unreasonable and thus we enforce this phase of the Board's order.

Under the same reasoning we believe that respondent's award of a $10 per week wage increase to Weisberg, another known Union adherent, following his assurance that he "was on the side" of management, and coming as it did during the pendency of representation proceedings, was properly found to fall within the proscription of Section 8(a) (1). Cf., Medo Photo Supply Corp. v. National Labor Relations Board, 321 U.S. 678, 686, 64 S.Ct. 830, 88 L.Ed. 1007 (1944).

The question of the alleged discrimination in the transfer of Dudley to the night shift is another close question which we again resolve in favor of the Board. As noted previously, Dudley was abruptly transferred, with neither notice nor explanation to the late night shift, within a month of his admission to Harrington that he as a staunch Union adherent. There is no question that the night shift was a less desirable assignment and as managing editor Connors acknowledged, an assignment to this shift was not a coveted one. Dudley testified that he considered night work to be "more strenuous" because it meant "living backwards, working nights and trying to sleep days, in which [he was having] great difficulty."

Respondent defends the transfer on the ground that the move was prompted by a concern for Dudley's personal welfare. However, we cannot escape the conclusion that had this been the real motive, then respondent's supervisors would, at the least, have counseled with Dudley before the transfer, or offered some explanation after it was accomplished. No such explanation was forthcoming and the employee was presented with a simple *fait accompli*. We believe that the Board's conclusion that the transfer was discriminatory is not unreasonable and should be upheld.

There remains the question of the status of employee Breen. As to him the Board found that the respondent's asserted anti-union animus had manifested itself in two distinct fashions. The first manifestation occurred on January 23, 1961 when Breen was replaced as Dracut County correspondent; the second occurred on March 20, 1961 when Breen was ultimately discharged from the newspaper. As noted previously, the Board found that each of these acts constituted violations of Section 8(a) (3) and (1) of the Act.

We do not disagree with the Board's characterization of the Dracut County correspondent facet of its findings as discriminatory. Initially we note that the timing of the company's act is scarcely helpful to its position. Thus, Breen was relieved of this assignment only eight days after the company had received the telegram from the Union requesting recognition, bearing, *inter alia*, the signature of Breen. Whether the virtual concurrence of these two events was chance, cause or consequence is, to be sure, a matter of inference. But, as we have stated above, the matter of elu-

cidating inference is best left to the Board. From all that appears from the record, Breen was performing creditably as Dracut County correspondent. While respondent contended that its action stemmed from complaints as to the caliber of Breen's work, the record indicates that the company had only brought one "complaint" to Breen's attention during his tour as Dracut County reporter, and that had occurred some eighteen months before the respondent saw fit to relieve Breen on January 23, 1961.

We find it difficult to believe that a complaint of such antiquity—whatever its residual vitality—was the impelling motive behind the company's decision to take Breen off the Dracut assignment. At the hearing the respondent presented the argument that Breen had never actually served as Dracut County correspondent at all but, in reality, the post had been filled by Mrs. Breen—as an independent agent and not as an employee of the respondent. Suffice it to say that, upon an examination of the record, we are convinced that Breen was the *de facto* Dracut County correspondent. Consequently, for the reasons canvassed above, we agree that Breen was discriminatorily relieved from this assignment because of his union activity in violation of Section 8(a) (3) and (1) of the Act.

■ However, we are unable to agree with the Board that employee Breen was discriminatorily discharged. The record is clear that Breen was twice, on successive Saturdays, assigned by respondent to a position of responsibility—whatever its precise level—and that Breen was fully aware of this fact. The record is equally clear that without seeking or receiving permission from his supervisors, he absented himself from his job on two separate occasions. Thereafter, in discharging Breen, the respondent made it clear to him that he was being separated for dereliction of duty. There can be no question that—union status apart—the respondent possessed the right to discharge employees for cause, and nothing in the Act suspends this right. A thorough examination of this record leaves us with the compelling conclusion that the defection of Breen on the two successive Saturdays was the impelling motive for his discharge and not his Union activities. The mere fact that he was a Union adherent does not immunize conduct, which would otherwise be grounds for discharge.

■ One of the reasons relied upon by the trial examiner in holding that the discharge was impelled by anti-union animus was testimony of Weisberg that one Sargent—the respondent's sport editor—had told him of hearing a "report" that the respondent had "set a trap" for Breen—*vis a vis* his attendance at the Dracut town meeting. Sargent denied this but the trial examiner credited Weisberg. There was no evidence as to the source of the report—whether it was rumor, speculation or a "report" actually initiated by Breen himself. This testimony was hearsay of the rankest variety and its acceptance by the trial examiner and utilization to support his findings of a discriminatory discharge was error. In this court the Board apparently recognizes the infirmities in the admission of such evidence but claims that it should be accorded "its rational probative value." Suffice it to say that, in our view, evidence of this character was neither probative, rational nor of value and its receipt was plain error.

For the foregoing reasons the portion of the Board's order insofar as it relates to Breen's ultimate discharge, will be denied enforcement. With respect to the Dracut County correspondent matter, Breen is entitled to back pay from the date of that discharge until the date of his principal discharge. After that misconduct he should have no further rights.

A decree will be entered enforcing the order of the Board to the extent consistent with this opinion.

ALDRICH, Circuit Judge (concurring).

Judge GIGNOUX and I concur in Judge HARTIGAN's opinion in all re-

spects. However, since this is a case in which we are reversing the Board not because there was no evidence of an anti-labor animus—the reverse is conceded, in view of the Dracut County correspondent discharge—but because we disagree that such was the "true reason" (to quote the Trial Examiner) for the discharge, we both would like to develop the discussion further.

 In the first place, we agree that Judge HARTIGAN has applied the proper test. In its brief the Board correctly adopts our language in N. L. R. B. v. Whitin Machine Works, 1 Cir., 1953, 204 F.2d 883, where we said, at 885, that a discharge " * * * may become discriminatory if other circumstances reasonably indicate that the union activity *weighed more heavily* in the decision to fire him than did dissatisfaction with his performance. * * * " (Ital. suppl.). Where a party has two motives, one permissible and the other impermissible, the better rule is what we there indicated, namely, that the improper motive must be shown to have been the dominant one. Cf. N. L. R. B. v. Whitelight Products Division, 1 Cir., 1962, 298 F.2d 12, 16, cert. den. 369 U.S. 887, 82 S.Ct. 1161, 8 L.Ed.2d 288; Simmons, Inc. v. N. L. R. B., 1 Cir., 1963, 315 F.2d 143; cf. Commissioner v. Young Motor Co., 1 Cir., 1963, 316 F.2d 267.

Otherwise there is a danger that knowledge that something will have a pleasing result will be confused with, and substituted for, actuating motive. See discussion in Young Motor Co. v. Commissioner, 1 Cir., 1960, 281 F.2d 488, at 491; Boston Mutual Life Ins. Co. v. Varone, 1 Cir., 1962, 303 F.2d 155, at 159. This is a particular danger in labor cases because once an anti-union animus has been shown it is always easy,

no matter how valid a proper cause for discharge may have existed, to say that "one" of the motives was the animus. This would lead to what we believe occurred here, that a militant union man would feel that he could safely behave as he chose.

 As to the Board's errors, Judge HARTIGAN has adequately covered its prejudicial reliance upon the particularly non-probative hearsay testimony of the "report" that respondent had "set a trap" for Breen.* But equally erroneous was its disregard of its own witnesses, and of totally undisputed testimony, in connection with its implicit conclusion that Breen's dereliction of duty was not serious. The Board said, "It is beyond dispute that Flynn was fully competent to perform the first of the enumerated duties of the deskman, to check for typographical errors, a task which he repeatedly performed." The only evidence as to Flynn's prior performance was that he, along with all other sports writers when on duty, severally checked for typographical errors, and reported to the deskman, who, in turn, made the necessary changes. Breen, a Board witness, testified even on direct examination that a serious typographical error might require changing the page for the second edition, and conceivably might require stopping the press, although this last had never happened in his memory. In other words, discovery of the error was only part of the checking procedure. It is conceded that Flynn had no experience with changing pages or other composing-room work. The fact is that he had never been a deskman, and was not competent to be such.

The further circumstance that still other admitted duties of a deskman, referred to by the Board but which need

---

* It might be added that there is a considerable difference between setting a trap and merely setting a watch. A husband who "baits" a trap, leading his wife to commit adultery, cannot rely on her ensuing misconduct as a ground for divorce. However, one who merely suspects, and watches in order to apprehend her, is not barred because he took no affirmative steps to prevent her activity. See, e. g., Wilson v. Wilson, 1891, 154 Mass. 194, 28 N.E. 167, 12 L.R.A. 524. The uncontradicted probative evidence in this case excludes any possibility that respondent did more than the latter.

not be here detailed, did not often require exercise does not mean that it was not a serious matter for Breen to take it upon himself to leave before the question of whether they would arise had been determined. Except for testimony by Breen that on half a dozen undescribed occasions he had previously left his desk unattended, but with no evidence that respondent knew of it, in several hundred pages there is no testimony that any deskman, with one exception hereafter referred to, had ever left his desk before his duties had been completed unless he left a competent substitute in charge, or obtained permission. The Board fails to mention Breen's admission that he had known for a week that he was going to leave prematurely on March 18, and had made no effort to comply with either of these requirements. If, in fact, his departure was inconsequential, it would seem that permission could have been sought and easily obtained. Having in mind the undisputed high responsibilities of a deskman, this dereliction cannot be disregarded as an oversight. Even at the last minute, when Flynn stated he was "sticking his neck out" by leaving, Breen could have gone down the hall and asked permission. His reply to Flynn directed against the company, which respondent accurately describes as a defiant obscene expression, indicated such an attitude of deliberate insubordination that for the Board to disregard or minimize it can only be construed as an unwarranted substitution of its judgment for respondent's as to how respondent was to run its business. Cf. N. L. R. B. v. United Parcel Service, Inc., 1 Cir., 1963, 317 F.2d 912.

The Board's conclusion is not supported by its statement that respondent's witness could not recall "the last employee of the editorial department that had been discharged." This was the unimportant part of the testimony. The important part, not mentioned, was that, although it was twenty years ago, a previous deskman with similar length of service had been summarily discharged under identical circumstances, and that this was the only occasion when such a breach of duty had occurred.

We are compelled to conclude that the Board, having determined that respondent was pleased that Breen had been guilty of such gross misbehavior as to become dischargeable, confused pleasure with cause. This it cannot do, absent evidence that respondent would not have considered Breen's conduct cause if that pleasure had not contributed. On this the burden was on the Board, and the evidence was all the other way.