## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## CAMCO, INCORPORATED, Respondent.

### No. 23048.

United States Court of Appeals
Fifth Circuit.

Dec. 2, 1966.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Leonard M. Wagman, Atty., N.L.R.B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Elliott Moore, Atty., N.L.R.B., Washington, D. C., for petitioner.

L. G. Clinton, Jr., H. L. Deakins, Jr., Houston, Tex., for respondent, Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., of counsel.

Before JONES and DYER, Circuit Judges, and SPEARS, District Judge.

SPEARS, District Judge:

■ This petition to enforce an order of the National Labor Relations Board presents the usual questions regarding the requisite substantiality of evidence to support the Board's findings as to violations of Section 8(a) (1) and (3) [1] of the National Labor Relations Act.

Respondent is a Texas Corporation [2] engaged in the manufacture and sale of

1. 29 U.S.C.A. § 158(a) (1) and (3). See also § 160(e).

2. The home base of Camco, Inc., is Houston, Texas. During the last twelve months they have shipped products valued in excess of $50,000 to points outside the state of Texas, thereby bringing them within the meaning of "commerce" as it is defined in Section 2(6) and (7) of the Act.

precision valves, regulators, and controllers primarily used in the oil industry.

The Board found [3] that the company violated the Act by discharging employees Jay Hughes, Homer Stone, Charles Greer and Warren Young because of their activity in behalf of the Union.[4] The Trial Examiner had concluded that only Hughes was illegally discharged. All four men had been lathe operators in the machine shop.

The record reveals that these discharges occurred in the early part of 1964, shortly after the Union had given notice to Camco via telegram of its intent to organize, and the four employees had undertaken organizational efforts on behalf of the Union. The telegram listed Hughes, Greer and Stone as employee organizers. Upon its receipt, the message was posted on the company bulletin board.

The company's position in opposition to the Union's efforts had been firmly but unemotionally stated in speeches by its president. He had also made it clear that he was determined to run a first class machine shop with every bit of time and material accounted for. In support of this policy the company had been, for some two years prior to the hearing in this case, working on the installation of a $50,000 IBM system of accounting for scrap. The system was completed about the first of 1964 and required employees to sign tickets for scrapped material.

■ We are not barred from setting aside the Board's decision if we cannot conscientiously find that the evidence supporting it is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view. At the same time, we realize that we are not at liberty to displace the Board's choice if it is between two fairly conflicting views, even though we would justifiably have made a different choice had the matter been before us de novo.[5]

■■ While an employer ordinarily may discharge an employee for a good reason, a bad reason, or for no reason at all, his action may be reversed if the Court finds that the discharge was motivated substantially by anti-union animus.[6] In this connection, an inference of unlawful motivation may be drawn from the fact that an employee is discharged shortly after his employer, who is openly opposed to the Union, learns that he is a Union organizer. However, that inference disappears if the Court, after examining the whole record, is convinced that the employer's showing of discharge for cause makes unreasonable a conclusion that it was because of Union affiliation.

Having considered the complete record as to each individual with the foregoing guidelines in mind, we agree with the Board that Hughes is entitled to reinstatement with backpay and interest, but we are of the opinion that the Board's decision reinstating Stone, Greer and Young is not supported by substantial evidence.

## THE DISCHARGE OF JAY HUGHES

Hughes was hired as a trainee in March 1960. By January 1963 he had advanced to third class turret lathe operator with a base pay of $2.20 per hour. He had received additional pay increases of 5 cents an hour and 10 cents an hour, the latter having become effective October 15, 1963, but awarded February 10, 1964.

On February 14, 1964, Hughes began work on 15 stem retainers. That day he completed one operation on six pieces. The night shift operator completed the same operation on nine remaining pieces.

3.  151 NLRB No. 25.

4.  International Association of Machinists, District Lodge 37, AFL–CIO.

5.  Universal Camera Corp. v. NLRB, (1950) 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456.

6.  NLRB v. United Parcel Service, Inc., (1 Cir. 1963) 317 F.2d 912.

The next work day, February 17, Hughes performed the second operation on all fifteen pieces. The foreman of the night shift of February 17 found a piece of scrapped material not bearing Hughes' identifying mark.[7] When Hughes arrived at work the next morning, his foreman directed him to take the scrapped piece to the inspection department and sign a ticket for it. Hughes protested that the part in question was a piece of dropoff material which he had used for a setup. Notwithstanding the protest, however, Hughes took the part to the inspection department and signed a scrap ticket for it. The same day, at the request of his foreman, he signed a letter of reprimand, which contained, among other things, a statement that the offense involved "could be a dischargeable offense". The next day Hughes was taken to the Vice-President's office and told that his signature on the letter of reprimand had cost him his job.

■ The Board's determination that Hughes was discharged in violation of Section 8(a) (1) and (3) of the Act is supported by the evidence. This employee had a satisfactory employment record, as was witnessed by his commendations and salary increases. When viewed in the light of the unconvincing reasons assigned for his discharge,[8] as well as the timing and the precipitate nature thereof, this constitutes substantial evidence to support the Board's decision.

## THE DISCHARGE OF HOMER STONE

Stone was hired as a burring trainee at $1.65 per hour. At the time of his discharge he had been transferred to the lathe department, and was receiving an hourly rate of $2.10.

Stone was given a rush job which involved three parts, but two of them were scrapped, because the reaming operation resulted in an eccentric cutting.

Under established procedures, the scrapped parts should have been charged to Stone. In this instance, however, he refused to sign either the scrap ticket or a written reprimand prepared as a consequence of his refusal to sign the ticket.[9]

■ From all of the evidence it is apparent that Stone was discharged as a consequence of his refusal to sign the scrap tickets and the reprimand, and not in reprisal for his known Union activities. In enforcing these procedures Camco was following an established policy with respect to the allocation of scrap production. The reprimand was reason-

---

7. The company assigned a symbol to each lathe operator as a means of identifying the source of each piece of work. The operator was required to mark his production with his symbol.

8. The company's vice-president testified that the fourth reprimand for scrap is not necessarily a matter of discharge. In this instance Hughes had not received four reprimands. The charge of falsifying records is nothing more than a belated attempt to strengthen its case against Hughes. There is no showing of a wilful attempt to falsify company records that would fall within the list of major offenses.

9. "While Stone testified to some items which might support a view that the circumstances surrounding the job in question were somewhat different from customary practice, they do no more than indicate his view that there was something suspicious afoot. The solid evi-

dence however fails to establish that there was any impropriety in his discharge. Rather the evidence indicates that he was properly charged with the responsibility of accounting for the scrap on this job, and his assertion * * * that the reamer had scrapped the parts does not appear to be convincing, particularly since the reamer could scrap the parts most likely only as a consequence of the initial operation being faulty.

"The circumstances immediately preceding his discharge also tend to indicate the propriety of management's action. He was given repeated opportunities to sign the ticket or the reprimand or both, * * *. Furthermore, unlike the situation involved in the Jay Hughes instance, Cook (the foreman) credibly testified that he had not been instructed to prepare for Stone's dismissal before the interview in Vice President Hughes' office." (Record, Vol. I, Trial Examiner's Decision, P 67–68)

able, and Stone's refusal to sign constituted insubordination and good cause for his discharge.

### THE DISCHARGE OF CHARLES GREER

Greer was hired in April, 1962, as a burring department trainee at $1.60 per hour. At the time of his discharge he had been transferred to the lathe department and was earning an hourly rate of $2.10. For a four and a half month period, August 15 through December 31, 1963, Greer was fairly well down on the list of scrap producers. However, during the months of January and February 1964 he was among the four highest. After first having been given an oral warning, Greer was issued a written reprimand in accordance with company rules and regulations. When he refused on three separate occasions to sign the reprimand he was discharged.

■ The requirement that the reprimand be signed was standard practice, and Greer committed an act of insubordination when he refused to sign it. The evidence is insubstantial to support the Board's finding of unlawful motivation in the discharge.[10]

### THE DISCHARGE OF WARREN YOUNG

Young was hired in 1956 as a trainee in the burring department at $1.50 per

hour. At the time of release he was a first class turret lathe operator with an hourly pay rate of $2.80.

In the latter part of April, 1964, Young drilled a part incorrectly and it was scrapped. His supervisor prepared a written reprimand referring to that and to a similar incident which had occurred in October, 1963. Although several times requested to sign the reprimand, Young refused to do so saying that it was a form of Union discrimination.

■ There is no doubt that Young had produced a piece of scrap. As already noted the company had an established policy with respect to its scrap program. Since Young had been given an oral warning only a few weeks previously, the written reprimand at this time was in order. The fact that he was afforded several opportunities to sign the reprimand, and was reminded of a pending increase in compensation, refutes the idea that his employer was anxious to get rid of him.[11] Here again, the employee was clearly insubordinate, and we are convinced that the Board's finding of unlawful motivation is not supported by substantial evidence.

The petition for enforcement will be granted as to the employee Jay Hughes, but denied as to the employees Homer Stone, Charles Greer and Warren Young.

10. "While there is evidence that Greer may have been assigned to a difficult and relatively unprecedented task sometime shortly prior to his release, there is no convincing indication that that played an operative part in his scrap production nor would it appear of any substantial value in ascertaining the reason for his termination." (Record, Vol. I, Trial Examiner's Decision, P 70) The Trial Examiner reached similar conclusions concerning testimony from Greer as to a change in attitude on the part of his foreman, Alexander, after the posting of the Union telegram, as well as with respect to evidence indicating disparate

treatment both as to their socializing on break time and remaining at the machine during down time.

11. "The testimony of Young would establish that in the period shortly after his organizational status became known to the company, his supervisor, Alexander, commenced some minor harassments. I regard this as insufficient to establish that there was any discrimination in this period, nor does it amount to necessary indications that Respondent had him marked for discriminatory treatment." (Record, Vol. I, Trial Examiner's Decision, P 71)