INTERNATIONAL BROTHERHOOD OF POLICE OFFICERS *vs.*
LABOR RELATIONS COMMISSION & others.[1]

Suffolk.  November 19, 1979. — January 29, 1981.

Present: ARMSTRONG, ROSE, & PERRETTA, JJ.

*Labor,* Police, Discharge for union activity.  *Police,* Discharge for union
activity.

In a proceeding on a union's complaint that a town had engaged in a
practice prohibited by G. L. c. 150E, § 10(*a*), when it declined to re-
new the appointments of five union members as police officers, there
was sufficient evidence to warrant a finding by the Labor Relations
Commission that no anti-union motive tainted the town's decision not
to reappoint four of the five officers, and that finding was not intrin-
sically inconsistent with the commission's further finding that the
town's decision with respect to the fifth officer was occasioned in part
by his having engaged in protected activities.  [270-274]

CIVIL ACTION commenced in the Superior Court on
July 30, 1976.

The case was heard by *Young,* J.

*Robert J. Canavan* for the plaintiff.

*Robert B. McCormack (David F. Grunebaum* with him)
for the Labor Relations Commission.

*James A. Toomey* for the Selectmen of the town of Den-
nis, interveners.

ARMSTRONG, J.  The plaintiff (union) brought this action
to obtain review under G. L. c. 30A, § 14, of a decision of
the defendant commission dismissing a complaint by the
union that the town of Dennis had engaged in a prohibited
practice (G. L. c. 150E, § 10[*a*][1], [3], and [4]) when it
declined at the end of 1974 to renew the appointments of
four union members as police officers of the town.  There

---

[1] Selectmen of the town of Dennis, interveners.

was a fifth such police officer, one Springer, whom the commission, by the same decision, had ordered the town to reinstate, finding that Springer's non-reappointment was occasioned in part by his having engaged in protected activities. The union's position, both in this court and the Superior Court, has been that the commission's finding that no anti-union motive tainted the town's decision not to reappoint the four officers was inconsistent with its finding that such motives did taint the town's decision not to reappoint Springer. A judge of the Superior Court upheld the commission's findings applicable to the four and dismissed the union's complaint. The case is before us on the union's appeal.[2]

We set out facts taken from the commission's extensive findings, indicating where appropriate any particular fact which is in dispute. For several years up to and including the period 1972 through 1973, the Dennis police department had been in a state of "extreme disorder", a state characterized by poor administration, lack of formal personnel policies, and frequent citizen complaints. The retirement of the police chief, who had been absent roughly forty percent of the time, presented an opportunity to upgrade the department. The selectmen solicited applications for the position and considered two hundred seventy-five candidates. They appointed one Cataldo, a former director of the Barnstable County Police Academy, who assumed office on March 1, 1974. He came to the job prepared to exercise firm control over the department, having been impressed by the selectmen that he was expected to correct longstanding deficiencies and to make hard and unpleasant decisions relative to personnel.

---

[2] The selectmen, by a separate complaint, sought judicial review under G. L. c. 30A, § 14, of the commission's decision ordering the reinstatement of Springer. That complaint, which was heard together with the one brought by the union, resulted in a remand to the commission for further findings with respect to whether the anti-union bias and retaliation for protected activities which were found to have tainted the decision not to reappoint Springer were a "dominant" reason for the decision and whether Springer would have been reappointed if it had not been for his union-supportive activities.

On November 19, 1974, the selectmen called Chief Cataldo before one of their regular meetings and asked him to submit a list of all non-tenured members of the department, listed in order of merit, with the understanding that names near the bottom of the list might not be reappointed for 1975.[3] He was instructed to discuss his list (after completing it) with the executive secretary to the board of selectmen, and the two were to recommend jointly to the selectmen who should not be reappointed. Chief Cataldo prepared such a list, and he had two senior officers, the captain of the department and a lieutenant, do the same. The executive secretary also prepared a list, working mainly from the staff evaluations, commendations, absences, and disciplinary actions shown in the personnel records. The four lists, independently prepared, were all submitted to the selectmen. At a meeting on December 10, 1974, the selectmen prepared a composite of the three lists prepared by the chief, the captain, and the lieutenant, adding the rankings received by each officer on the three lists and arranging the officers on the composite list in order of point totals. The five officers ranked lowest on the composite list (which had fifteen names in all) were the same five who appeared at the end of the executive secretary's list. The selectmen decided not to renew the appointments of all five.

The commission heard testimony by the selectmen that union activity was not considered by them at all in making that decision, that their decision which men not to reappoint was based solely on the four independent evaluations which had been submitted. The commissioners were entitled to believe that testimony, and they expressly did so, despite the fact that they also found that the introduction of the union in late 1972 had provoked the hostility and active opposition of the selectmen and one of the four evaluators

---

[3] In May, 1974, the Dennis town meeting, with the support of the selectmen, had accepted G. L. c. 41, §§ 126-132, which gave tenure to police officers after five years of service to the town. All officers had previously been subject to reappointment annually.

(Lieutenant Kelley).[4] Two of the five officers were union members and attended union meetings but were not otherwise notable for union involvement. Two others of the five served as members of the local union's board of directors, one being the vice president and the other the treasurer. The former was a member of the collective bargaining committee which engaged in contract negotiations with the town; the latter made his home available for union meetings. Despite those union involvements the commissioners were not required to find that the decision not to reappoint the men was based on their union activity. Three of the four evaluators were not involved in any significant way in the hostilities surrounding the patrolmen's decision to unionize two years earlier. The rankings made by the one (Lieutenant Kelley) were not significantly out of line with the evaluations furnished by two of the three others. Significantly, two active union leaders (Officers Summers and Symington, president and secretary of the local respectively) scored relatively high in the rankings.

---

[4] The commission found that "while an initial anti-union bias existed among the Board [of Selectmen], this bias was substantially dissipated over time" — a finding the union assails as lacking support in the evidence. There was evidence, however, that the selectmen negotiated a contract with the union in late 1972 (signed, the union points out, in the name of the patrolmen rather than the union, but executed, nevertheless, by the president of the local, who testified that he executed the contract on behalf of the union); that the terms of employment achieved by the Dennis department compared favorably with those achieved in other towns on Cape Cod; that the selectmen fulfilled their duty of sponsoring the collective bargaining agreements, resulting in their acceptance at town meeting; that the board considered grievances conscientiously; and that the selectmen tried (through town counsel) to get legislative approval for a three-year tenure plan worked out in concert with the union and, failing that, sponsored local acceptance of the five-year tenure law approved by the Legislature (see n.3). In December, 1973, following threats made by Lieutenant Kelley to Springer concerning his union membership, the members of the board of selectmen declared in writing that "no disciplinary action would be taken on the part of the Board of Selectmen against any patrolman because of any union affiliation on his or her part." On the whole record we are unable to say that the commission was not warranted in concluding that anti-union sentiment had substantially dissipated by late 1974.

Officer Springer's evaluation involved a number of factors which differentiated his case from the other four. In October, 1973, Lieutenant Kelley, upset at local newspaper publicity given to a prohibited-practice complaint which the union was said to be contemplating filing against the town, took Springer aside and advised him to quit the union, said that if the union "comes down and causes trouble, a lot of good men might lose their jobs," and ended by threatening to have Springer discharged if he didn't quit the union. Springer responded by divulging the conversation. The union's grievance committee sought a meeting with the selectmen, and Springer testified concerning the threats. The selectmen ultimately assured the union, in a statement mentioned in note 4, *supra*, that despite Kelley's threats "no disciplinary action would be taken . . . against any patrolman because of any union affiliation on his or her part."[5] In April, 1974, there was another incident involving friction between Kelley and Springer. The latter was attending a union meeting at the stationhouse during a time when he was assigned to cruiser patrol. He had complied with the then-practice of notifying the officer-in-charge and keeping in touch via portable radio. Lieutenant Kelley nevertheless ordered Springer and another on-duty officer back out on the road. According to one version, denied by Springer, he responded by uttering a profanity and making a gesture towards his service revolver. The result was that Springer was given a two-day suspension by Chief Cataldo. Springer chose to contest the suspension before the board of selectmen, and a lengthy and acrimonious hearing ensued in which Springer testified and was represented by the union. There was ample evidence that, as a result of these incidents, Springer was regarded with particular animosity by several of the leading figures in the board of selectmen and

---

[5] The commission surmised that Springer's revelations hurt Kelley's chances of being appointed chief of the department, a position for which he was a candidate. Cataldo was appointed to the position not long thereafter.

the police department — a hostility personal in nature, not paralleled in the cases of the other four non-reappointees. We discern no intrinsic inconsistency between the commission's findings that Springer's evaluations were the product, in part, of anti-union bias while the others' evaluations were not,[6] and, as to the commission's findings with respect to the four officers whose cases are presently before us, we conclude that those findings were supported by substantial evidence. A contrary result would be tantamount to a holding that, whenever the commission finds that an employer harbors a measure of anti-union feeling, however slight, it is required, as matter of law, to reinstate any union employee discharged by the employer, whether or not there is a causal connection between the anti-union bias and the discharge, and regardless of any sound and proper reasons the employer may have had for his action. The trial judge and the commission correctly rejected that view. See *Mt. Healthy City School Dist. Bd. of Educ.* v. *Doyle*, 429 U.S. 274, 285-287 (1977); *NLRB* v. *Lowell Sun Publishing Co.*, 320 F.2d 835, 841 (1st Cir. 1963) and 842 (Aldrich, J., concurring); *Coletti's Furniture, Inc.* v. *NLRB*, 550 F.2d 1292, 1293 (1st Cir. 1977).

The trial judge also acted correctly, for the reasons which he stated, in refusing the union's request that the case be remanded to the commission, over the opposition of the latter, for a determination whether the town's unilateral adoption

---

[6] In addition, Springer was the only one of the five non-reappointees to receive a "satisfactory" rating in the last routine departmental evaluation reports made prior to the termination decisions. (The December, 1974, special, selectmen-ordered evaluations were made for the specific purpose of determining whom not to reappoint.) This fact was found by the commission in its findings on remand (see note 2, *supra*). The union filed a motion to supplement the record, asking that the commission's findings on remand in Springer's case be considered by this court in connection with the present decision. We have allowed the motion. The decision on remand tends to reinforce the view that Springer's non-reappointment turned on factors peculiar to his case, rather than on anti-union animus generally.

of the performance-evaluation "system", without collective bargaining, may have violated G. L. c. 150E, § 10(*a*)(5). No charge of prohibited practice, timely or otherwise, had brought this issue before the commission; and the union was not entitled to raise it in court in the first instance.

*Judgment affirmed.*