**NATIONAL LABOR RELATIONS BOARD, Appellant,**

v.

**SCHILL STEEL PRODUCTS, INC., Appellee.**

**No. 21110.**

United States Court of Appeals
Fifth Circuit.

Jan. 11, 1965.

Lawrence Gold, Atty., Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Arnold Ordman, Gen. Counsel, Elliott Moore, Robert A. Armstrong, Attys., N. L. R. B., Washington, D. C., for appellant.

Henry L. Scott, Houston, Tex., Trotter, Childs, Fortenbach & McClure, Houston, Tex., of counsel, for appellee.

Before WISDOM and GEWIN, Circuit Judges, and HANNAY, District Judge.

WISDOM, Circuit Judge:

The National Labor Relations Board seeks enforcement of two orders against the respondent, Schill Steel Products, Inc. These orders are based on two Board decisions holding that Schill: (1) violated Section 8(a) (1) of the National Labor Relations Act by improper interrogation of employees and by making threats and promising benefits during a union organizational drive; (2) violated Sections 8(a) (3) and (1) by discriminatorily discharging two men, Wilburn Brown and Columbus Caldwell; (3) violated Sections 8(a) (5) and (1) by refusing to bargain with the certified representatives of its employees. We grant enforcement of both orders.

Schill Steel Products, Inc., a Texas corporation engaged in the distribution of steel and metal products, maintains its principal office and warehouse in Houston, Texas; branch warehouses in Dallas and Odessa, Texas, and in Tulsa, Oklahoma. At its Houston warehouse the Company employs about fifty men, including a warehouse foreman, two supervisors, and four so-called "bay leadermen". The warehouse is divided into four interconnecting bays and a shear department. Each bay handles a different type of steel.

In May 1962 some of the Company's Houston employees were collaborating with the United Steelworkers to organize a union at the Houston warehouse. May

21, the Union petitioned the Board for certification. The Union forwarded a copy of the petition to the Company with a letter informing it that the Union represented a majority of the employees in the Houston warehouse and requesting recognition and bargaining. During the second week in June, warehouse foreman Sanders discharged Columbus Caldwell and Wilburn Brown; both actively supported the Union.

July 13, 1962, the Board's regional director ordered an election at the Houston warehouse. The Company filed a motion for reconsideration, on the ground that the collective bargaining unit should have been company-wide, and not confined to the Houston plant. The regional director denied the Company's motion. The Board, acting through a single member, denied the Company's petition for review. In the ensuing election, the Union received a majority vote and was certified August 31. Shortly after the election, following the respondent's refusal of the Union's request for wage and other information, the Union filed a charge alleging that the Company would not recognize it as the duly certified bargaining representative of the Houston workers, in violation of Section 8(a) (5) of the National Labor Relations Act. December 13, 1962, the Board, five members participating, issued a "Ruling on Reconsideration", affirming the action of the regional director in ordering an election limited to the Houston warehouse. The Company persisted in its refusal to bargain with the Union, and granted two unilateral wage increases in February and March 1963. From March 11, 1963, to April 4, 1963, the employees in the certified unit engaged in a strike, called because the Company refused to recognize the Union.

Meanwhile, the Board, August 1, 1962, had issued a complaint based on the Union's charge that Columbus Caldwell had been discharged for union activity and that the Company had interfered with its employees in the exercise of their rights under Section 7 of the Act. The trial examiner, finding for the Union,

recommended that the Company cease and desist from the unfair labor practices found, and that it reinstate Caldwell, making him whole for any losses suffered. In a decision and order dated. February 8, 1963, the Board upheld the findings and recommendations of the examiner. May 27, 1963, after a hearing on two other consolidated complaints based on charges and amended charges by the Union, the trial examiner recommended that the Company stop interfering with its employees in the exercise of their right to engage in union activity; that it reinstate and make whole Wilburn Brown; that it reinstate, on application, and make whole all workers who had engaged in the strike and not been rehired; and that it recognize and bargain collectively with the certified unit. The Board, in a decision and order dated August 20, 1963, again adopted all findings and recommendations of the trial examiner. 140 NLRB 1164; 144 NLRB No. 11. The Company appeals from both decisions.

## I.

Substantial evidence supports the Board's finding that the Company violated Section 8(a) (1) of the Act by interrogating employees concerning their attitude toward the Union, by threatening employees with loss of benefits if they selected the Union to represent them,. and by promising benefits during the organizational campaign.

We are not faced with the all too familiar task of trying to divine at two degrees removed the coercive force of mere interrogation in a more or less hostile atmosphere: specific and literal threats of reprisal came from the respondent's top executives. Three of the Company's employees, Henry Wilson, Henry Johnson, and Predo Braden, testified that leaderman Lovett arranged a meeting between them and John and Richard Schill, the president and vice-president of the Company. At this meeting vice-president Richard Schill said that if the Union came in he would cut out the Christmas bonus and trust fund..

President John Schill recalled the meeting, and admitted alluding to instances in which neighboring companies had eliminated pension plans as a result of unionization by their employees; Richard Schill did not testify at the hearing. The respondent's brief is eloquently silent on this incident.

Leaderman Alsobrooks testified that he, leadermen Griffin and Brownschidel, and supervisor Miller, attended a meeting where warehouse foreman Sanders told them that they were to report anyone seen talking about the Union. There was testimony that Alsobrooks and Brownschidel had asked Caldwell, Brown, and certain other employees about their feelings toward the Union. Employee Wilburn Brown testified that leaderman Lovett told him that John Schill, the Company's president, intended discharging the Union leaders when he found out who they were. Another employee testified that Lovett had made similar threatening statements to him. There is no doubt that such conduct interferes with rights guaranteed under Section 7 of the Act and violates Section 8(a) (1) of the Act.[1]

Respondent argues that the transgressing leadermen either were not supervisors within the meaning of Section 2(11) of the Act[2] or, at worst, were only "minor supervisory personnel". In either event, says the Company, it is not responsible for their conduct. This Court has held that the mere fact that an employee exercises some degree of administrative discretion does not make him a supervisor whose actions are attributable to management. Poultry Enterprises, Inc. v. N. L. R. B., 5 Cir.1954, 216 F.2d 798. Whether an employee shares in the power of management must be determined on the facts of each case.

There is ample testimony as to the duties and powers of the bay leadermen. Foreman Sanders admitted that the leadermen were more capable, more experienced, and higher paid than ordinary workers. Leadermen had authority to assign employees within each bay to the jobs for which the leadermen considered them best suited, and to direct employees to work on certain orders ahead of others. Sometimes the leadermen helped and instructed the regular employees. The leadermen gave the ordinary workers permission to take time off and to change their working hours, checked their work, and initialed timecards of employees who had forgotten to punch the clock. There were no intermediate supervisors between the plant foreman and the leadermen. In a list of employees made up by the Company and sent to the Board, each of the leadermen was described as a "Foreman". Leaderman Brownschidel, who had been supervisor of the night crew before becoming leaderman of bay four, testified that the change in position had not affected either his salary or his authority. On one occasion an employee was fired on Brownschidel's recommendation. Several employees testified that plant foreman Sanders had told them that leaderman Alsobrooks was their "foreman" or "boss". The trial examiner found that one employee had been hired solely on the recommendation of leaderman Lovett. Not least important, the Company chose the leadermen as its agents to keep tabs on union activity.

1. Sweetlake Land and Oil Company v. N.L.R.B., 5 Cir. 1964, 334 F.2d 220, 223; Martin Sprocket & Gear Company v. N.L.R.B., 5 Cir. 1964, 329 F.2d 417, 419–420; N.L.R.B. v. Dell, 5 Cir. 1960, 283 F.2d 733, 736; N.L.R.B. v. Dan River Mills, Inc., 5 Cir. 1960, 274 F.2d 381, 384; N.L.R.B. v. Ferguson, 5 Cir. 1958, 257 F.2d 88, 89–90; N.L.R.B. v. Coats & Clark, Inc., 5 Cir. 1957, 241 F.2d 556, 557; N.L.R.B. v. McGahey, 5 Cir. 1956, 233 F.2d 406, 409–410.

2. Section 2(11) provides as follows:
    "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

We hold that the record supports the finding that the leadermen are supervisors, for whose conduct management must be held responsible. Cf. N. L. R. B. v. Arkansas-Louisiana Gas Company, 8 Cir.1964, 333 F.2d 790, 795–796; N. L. R. B. v. Southern Airways Company, 5 Cir.1961, 290 F.2d 519.

## II.

■ A. Wilburn Brown played an active rule in organizing the Union. The Company discharged him June 11, 1962. Company officials said that he was insubordinate and lazy; besides, economic necessity required a reduction in force. There is no doubt that the record supports the Board's holding that Brown was not discharged because of insubordination or laziness. The explanation for Brown's discharge on which the Company chiefly relies is that Brown was simply one of several employees laid off for economic reasons.

President Schill testified that during May 1962 he attended a meeting of the Steel Service Center Institute where he learned that his Company's costs were higher than those prevailing in the industry. In June 1962 the Company's quarterly earnings report showed a deficit for the first time in the Company's history. Visits by Schill to other steel warehouses revealed, allegedly, that other companies were handling more orders with less personnel. As a result of all of this, Schill told Foreman Sanders to cut down the work force at the Houston plant. Sanders, at the hearing, recalled Schill's instructions, and testified that he had selected Brown for discharge because Brown was lazy, shiftless, and insubordinate. Sanders fired six or seven other men (including leaderman Alsobrooks) "over a period of time".

President Schill's austerity program appears to have been an afterthought.

First, the record brims with evidence of the Company's anti-union animus. Second, Brown had actively supported the Union, had signed a union authorization card, solicited signatures from other employees, attended union meetings, and served on the organizing committee. Finally, Company supervisors knew that Brown was working for the Union. Leadermen Alsobrooks and Lovett each interrogated Brown about the Union, told him about the anti-union feelings of President Schill and Foreman Sanders, and warned him of the consequences of union activity. Alsobrooks asked Brown whether he was still the "leader of the union". On one occasion Brown told leaderman Lovett that he was on the organizing committee. The trial examiner credited Alsobrooks's testimony that, shortly after an incident, in which Brown had, allegedly, been insubordinate to Alsobrooks, Sanders asked him if he had "anything else" against Brown. Alsobrooks replied that he did not. Sanders then told Alsobrooks that he, Sanders, "had to let Brown go," and that he wanted Alsobrooks to "make [Brown] mad so he would have a reason to fire him". At the hearing Sanders denied having known that Brown or any other employee was working for the Union, and asserted that he knew that there was union activity going on only because of the petition that had been sent to John Schill. The trial examiner found Sanders's denial incredible.

■ A finding of knowledge of union participation may be based on circumstantial evidence.[3] Here the evidence overwhelmingly supports the examiner and the Board.

B. Columbus Caldwell, like Brown, was an active union organizer. Alsobrooks described him as a "good worker". He had signed an authorization card and induced other employees to do so; he

3. N.L.R.B. v. Link-Belt Co., 1941, 311 U. S. 584, 602, 61 S.Ct. 358, 85 L.Ed. 368; N.L.R.B. v. International Union of Operating Engineers, Hoisting and Portable Local No. 101 of Greater Kansas City and Vicinity, 8 Cir. 1954, 216 F.2d 161, 164; N.L.R.B. v. Radcliffe, 9 Cir. 1954, 211 F.2d 309, 315; N.L.R.B. v. Abbott Worsted Mills, 8 Cir. 1942, 127 F.2d 438, 440; F. W. Woolworth Co. v. N.L.R.B., 2 Cir. 1941, 121 F.2d 658, 660.

was on the Union organizing committee; and when bay leaderman Brownschidel asked Caldwell whether he was for the Union, Caldwell answered that he thought the Union was a "good thing to have".

The Company contends that Caldwell was fired as a result of an incident that occurred on June 8, 1962, and because of the Company's cost cutting program. June 8, 1962, Caldwell, who was supposed to report for work at 8:00 A.M., arrived at the plant at 6:45 A.M. Apparently, it was the custom of certain employees to report early because overtime work was often available. Between 6:45 and 7:00, Foreman Sanders went into the locker room and told the employees that he needed men in the warehouse. Some went; many did not. Sanders, annoyed, returned to the locker room and told the remaining employees that if they were not out in two minutes they need never punch the clock before eight o'clock again. Most of the men went to work. Three, including Caldwell, stayed in the locker room. Caldwell testified that the first time Sanders asked for men he could not get to his locker to change clothes, because the locker room was too crowded. He said that when Sanders came back, he was still getting dressed and using the bathroom, and could not have been ready in two minutes. Taking Sanders at his word, Caldwell waited in the locker room until eight o'clock. Sanders tells a different tale. Sanders testified that when he made his second appearance in the locker room, Caldwell said, in a sarcastic tone, that he would "just wait until eight o'clock". Sanders asserts that he decided to fire Caldwell the moment Caldwell "popped off". But Caldwell was not fired until five days after the incident took place. The examiner drew the fair inference that Sanders was not the sort of person who would have waited five days to let Caldwell know that he was angry.

The alleged "austerity program" is an even less likely motive for the discharge of Caldwell than it was for that of Brown. The fact that gave rise to the locker room incident—the need for employees to work overtime—is hardly an indication that the Company had to cut down its work force. At one point in the hearing, Sanders, asked whether Schill's instructions about cost-cutting had any bearing on the discharge of Caldwell, answered, "No, it did not". Asked again, Sanders said, "Of course, I naturally considered him as one of the undesirables and that is the kind of men laid off in this economical layoff and discharge, that's right". The Company's vacillation and the multiplicity of its alleged reasons for firing Caldwell render its claims of nondiscrimination the less convincing. Cf. N. L. R. B. v. Georgia Rug Mill, 5 Cir. 1962, 308 F.2d 89, 91.

Substantial evidence on the record as a whole supports the trial examiner's finding that Caldwell's failure to report for "voluntary" overtime work was only a trivial incident, and that economic necessity was not the Company's motive; Caldwell was selected for discharge because of his union activities.

### III.

A. Schill defends its refusal to bargain on two grounds. First, it argues that it was not obliged to bargain with the plant-wide union chosen by the Board, because the appropriate unit should be a company-wide unit.

The Company argues that each of its warehouses handles the same sort of work in the same way, that its truck drivers do a certain amount of inter-warehouse hauling, that the bookkeeping and preparation of payroll for all the warehouses takes place at Houston, and that all the warehouses are managed from the Houston office. Wages and employment benefits have, for the most part, been the same at all company plants. Furthermore, Schill points out, the Union wrote a letter to the regional director (after he had made his determination), saying that it would have no objection to a company-wide election.

Unmoved, the regional director determined:

"In view of the geographic separation of the various facilities, the lack of employee interchange, the separate immediate supervision at each location, the absence of any bargaining history, and the fact that no other labor organization seeks a broader unit, I find, notwithstanding the degree of interrelation which exists between the Houston facility and the branch establishments, that a unit confined to production and maintenance employees, including truck drivers and plant clericals at the Houston facility is appropriate."

There are so many good reasons one may easily find for the propriety of any particular unit's serving as the bargaining agency that anyone attacking the appropriateness of a certified bargaining unit wages an uphill fight. Section 9(b) of the Labor Relations Act,[4] and the cases interpreting it, give the Board wide discretion in choosing a bargaining unit. Judicial review of the Board's choice is narrowly limited. N. L. R. B. v. Jones & Laughlin Steel Corp., 1947, 331 U.S. 416, 422–423, 67 S.Ct. 1274, 91 L.Ed. 1575; N. L. R. B. v. Packard Motor Car Co., 1947, 330 U.S. 485, 491–492, 67 S.Ct. 789, 91 L.Ed. 1040; N. L. R. B. v. Hearst Publications, Inc., 1944, 322 U.S. 111, 134–135, 64 S.Ct. 851, 88 L.Ed. 1170; Pittsburgh Plate Glass Co. v. N. L. R. B., 1947, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251; Texas Pipe Line Co. v. N. L. R. B., 5 Cir.1961, 296 F.2d 208, 210. The party challenging the appropriateness of a cer-tified unit bears the burden of showing that the Board has abused its discretion. Diversey Corp. v. N. L. R. B., 7 Cir. 1963, 325 F.2d 489, 491. Schill has made no such showing.

B. Second, Schill asserts that the disposition, by a single member of the Board, of its request for review was improper under Section 3(b) of the Act.[5] Any defect was cured by the Board's later five-member "Ruling on Reconsideration." See Miami Herald Publishing Company v. Boire, S.D.Fla. 1962, 209 F.Supp. 561; see also Miami Newspaper Printing Pressmen's Union Local 46 v. McCulloch, 1963, 116 U.S.App. D.C. 243, 322 F.2d 993, 998. The brevity of the one-page ruling is no ground for the contention that the ruling was superficial and improper. The Board is not required to issue an elaborate opinion on every case that comes before it for review. Cf. N. L. R. B. v. Champa Linen Service Co., 10 Cir. 1963, 324 F.2d 28, 30; Cupples Company Manufacturers v. N. L. R. B., 8 Cir. 1939, 103 F.2d 953. Schill's other charge, that the five-member review was held only at the prompting of investigatory and prosecutory personnel in the General Counsel's office, in violation of Section 5(c) of the Administrative Procedure Act,[6] overlooks the introductory paragraph of Section 5 excluding from its ambit adjudications involving "the certification of employee representatives".

Enforcement of the Board's orders is granted.

---

4. 29 U.S.C. § 159(b):
"The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof."

5. Section 3(b) (29 U.S.C. § 153(b)) provides that the Board is authorized to delegate to the regional directors the power to select appropriate collective bargaining units. On request of any interested person, the Board "*may*" review the regional director's determination.

6. 5 U.S.C. § 1004(c).