NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

ATKINS SAW DIVISION OF NICHOLSON FILE COMPANY, Respondent.

No. 25201.

United States Court of Appeals
Fifth Circuit.

Sept. 4, 1968.

**908**

Marcel Mallet-Prevost, Asst. Gen. Counsel, Robert S. Hillman, Atty., NLRB, Washington, D. C., for petitioner.

Earl W. DeHart, Memphis, Tenn., for respondent.

Benj. L. Erdreich, Birmingham, Ala., Bernard Kleiman, Gen. Counsel, United Steelworkers of Am., Pittsburgh, Pa., for intervenor United Steelworkers.

Before WISDOM and COLEMAN, Circuit Judges, and RUBIN, District Judge.

COLEMAN, Circuit Judge:

This is a proceeding to enforce an order of the National Labor Relations Board pursuant to § 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(e).

The Board found that the respondent, Atkins Saw, violated § 8(a) (1) of the Act by interfering with, restraining and coercing employees in the exercising of rights guaranteed in § 7. The Board found also that the respondent violated § 8(a) (3) and (1) of the Act by discharging employee Joe Gunter because of his activity in support of the union. The Board ordered the company to cease and desist from interrogating and threatening its employees unlawfully as to their union membership and activities and from discharging or otherwise discriminating in respect to the hire and tenure of any employee for the purpose of discouraging membership in any labor organization. The company was ordered to reinstate employee, Joe Gunter, with back pay, and to post an appropriate notice of the order.

Prior to the events which culminated in these proceedings, the employees at Atkins Saw were not represented by a labor organization. During 1965, the union began an organization campaign at the respondent's plant. The events involved in this controversy occurred during the campaign.

On July 27, 1965, Bobby Helms, a maintenance department employee, approached his supervisor, Julius Hausz, and told him that he had something he wanted to tell Hausz but that he would not do so in the work area. Hausz arranged a meeting in the office of Personnel Manager Jones. At that meeting, Helms told Jones and Hausz that a union was being formed and that a meeting was scheduled for that evening. He further stated that he liked the company, he wanted no part of the union, and he would tell them what went on at the meeting that night. During this conversation Jones interrupted Helms and assured him that the company was not asking him to tell them anything and that anything he had to say would be voluntary. When Helms told Jones and Hausz that he would go to the meeting and report back to them, Jones told him

to make any subsequent statements to his foreman, Mr. Hausz.

Helms attended the union meeting that evening and the next morning reported to Mr. Hausz. Mr. Hausz testified that "Mr. Helms said that there was four people had attended the meeting from the maintenance department and the four people were Clayton Moss, Carl Pittman, Joe Gunter, and Fabik, Sam Fabik, and I thanked him and, then, I turned around to my desk and that's as I remember it". This information was relayed from Mr. Hausz to Mr. Jones.

Sometime in July, 1965, Mr. Darcie McKennon, a supervisor in the tool and die department, approached employee, William T. Hudson, at the latter's work bench, and told him that certain meetings were going on that he did not like, adding that "a lot of loud talkers are getting themselves in trouble at these meetings" and that Hudson, at this particular time plagued with domestic troubles, could not afford to have any more difficulty. On this occasion Mr. McKennon said that he was not going to let any group cause him [to lose] his job and that the employees might "think the same way also". He then invited Hudson to consider the matter and make it clear "which side of the fence you are on". At that time McKennon either had knowledge or strongly suspected that Hudson was a member of the union or was about to join.

A second meeting between McKennon and Hudson, arranged with some formality and held in the office of Mr. Groth, a management official, took place in August. During this conversation, McKennon made it clear to the employee that he was unhappy with Hudson's contact with known union adherents, Harry Allen and Robert Little. Hudson replied that he knew what McKennon was referring to but that he had signed the union card. He assured McKennon that he would not try to organize any other employees so long as his name was not on the organizing list. Mr. McKennon gave the impression that if Hudson would make it clear that he was for the

company and not for the union some of Hudson's mistakes could be overlooked.

Late in July, McKennon talked with Harry Allen and Robert Little at their work stations. He told them that he knew they had been carrying on union activities on company time, that a lot of things went on in the plant that he did not turn into the office, and that he knew everything that happened at union meetings fifteen minutes after it occurred.

Joe Gunter, one of the four men who was mentioned by Helms as attending the July 27 union organizational meeting, was hired by the respondent company as an instrument man in November, 1964. At the time of his employment, he was completely untrained for the job. In accordance with the prevailing company policy, Gunter was placed on probationary status for ninety days. During this time a "Progress Report" on his performance was made in writing, on a company form, and filed for each thirty day period of the ninety day probation. The first of these reports showed that Gunter was occasionally late and that, although he was industrious and cooperative, he was quite slow in work produced and ability to learn. The second report indicated that there was still considerable doubt concerning his retention as an employee. The last report recommended that Gunter be retained, although he received ratings of "slow", "careless", and "many errors". Contrary to company policy, Gunter was not given a merit increase in pay at the end of the probationary period.

A longhand memorandum written by Mr. Hausz dated July 13, 1965, indicated that Gunter was loafing on that date and that the supervisor had warned him about keeping his work up. This memorandum to Mr. G. W. Singley, Mr. Fabel's file. The evidence, however, reveals that Gunter was never advised of this memorandum, and it was never shown to him.

On July 27, 1965, Mr. Fabel, an engineer with the company, sent a memorandum to M. G. W. Singley, Mr. Fabel's boss, stating that Joe Gunter's work had

never been good and recommended that something be done to correct the situation. In the memorandum, Mr. Fabel pointed out that Gunter had failed to conduct a test on the temper furnace innumerable times, the last being earlier that week. On July 29, this memorandum was transmitted by Singley to Mr. Groth through another memorandum. Mr. Singley stated that he believed the attached letter from Mr. Fabel was serious enough that the situation should be corrected. He added that he had "heard this problem discussed too frequently since we hired this man to perform these services". Later that day, Gunter met with Jones and Hausz and was notified that he was being immediately discharged. He was told at that time that the reason for his discharge was his inability to perform the work properly.

On the basis of these facts, the Board found that the company had engaged in surveillance in violation of § 8(a) (1) by its management officials' arranging with Helms to attend the union meetings and to report back the events of that meeting to Helms' supervisor. The Board further found that the company violated § 8(a) (1) when supervisor McKennon interrogated Hudson, Allen and Little about union activities. Finally, the Board held that the company discharged employee, Joe Gunter, for discriminatory reasons, thereby violating § 8(a) (3) and (1) of the Act.

■ We proceed on the premise that the Board's decision cannot be overturned if supported by substantial evidence upon viewing the record as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). But we are equally mindful of the fact that, on review, "Courts are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute". N. L. R. B. v. Brown, 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1964).

■■ We hold that there was substantial evidence for the Board's finding that the company violated § 8(a) (1) by interrogating employees, Hudson, Allen, and Little, concerning union activities during the organizational drive. This Court has consistently held that interrogating employees concerning their attitude toward the union, promises of benefits, and thinly veiled threats are in violation of § 8(a) (1). N. L. R. B. v. Schill Steel Products, Inc., 5 Cir., 1965, 340 F.2d 568, 569; Hendrix Mfg. Co. v. N. L. R. B., 5 Cir., 1963, 321 F.2d 100; N. L. R. B. v. Moore Dry Kiln Co., 5 Cir., 1963, 320 F.2d 30.

■■ After a close examination of the facts, however, we cannot say that substantial evidence in the record supports the Board's finding that the respondent violated § 8(a) (1) by alleged surveillance of the union meeting on July 27, as a result of the conference with employee, Helms, earlier that day. As this Court stated earlier, surveillance is a violation of the Act

"Because it indicates an employer's opposition to unionization, and the furtive nature of the snooping tends to demonstrate spectacularly the state of the employer's anxiety. From this the law reasons that when the employer either engages in surveillance or takes steps leading his employees to think it is going on, they are under the threat of economic coercion, retaliation, etc."

Hendrix Mfg. Co. v. N. L. R. B., 5 Cir., 1963, 321 F.2d 100, 104–105, footnote 7. Thus, it is clear that not all acts of surveillance are prohibited under the Act. For an employer to violate § 8(a) (1) by surveillance, interrogation or any other unlawful act, he must "interfere with, restrain, coerce" employees in the exercise of their § 7 rights.

This record is void of any evidence that there was any interference with coercion or restraint on the part of the company as a result of the meeting with Helms. The Trial Examiner concluded that the company made an "arrange-

ment" or had an informal understanding with Helms that he would report union activities to the employer. Yet this conclusion was based on evidence which plainly indicates that Helms requested the conference, that the statements by him were entirely voluntary, and that during the conference he was explicitly warned that the employer could ask no questions concerning union activities. These facts do not justify the finding of an arrangement or informal understanding to spy on the union meeting. To the contrary, the entire matter seems little more than an effort of one employee to announce his support for the company and his opposition to the union. Instead of making any arrangement with Helms, as could be inferred if Jones and Hausz remained silent or actively encouraged Helms' statements, it is clear that Jones made every reasonable effort to announce to Helms that the company was not seeking any information about the union organizational drive. Jones' concluding statement that Helms was to make further observations to his foreman, Hausz, likewise leads to no inference of an arrangement. This was merely a general statement that, in the future, Helms should go through the proper chain of authority to air his ideas.

In our opinion, the Act does not require that management officials, in every casual, informal conversation must close their ears to employee statements so as to exclude the possibility of the employee's volunteering information about union activities. In this case, the employer had nothing to do with initiating the conversation and made it quite clear that Helms was under no obligation to continue such talk. We decline to read coercion or a threat of retaliation into this occurrence.

■ We now turn to the charge that Atkins File unlawfully discharged Joe Gunter, thereby violating § 8(a) (3) and (1).

It is undeniable that Gunter was less than a satisfactory worker. The "Progress Reports" on his performance show that he was quite slow to produce work, he was given no merit raise throughout his entire term of employment. The Trial Examiner conceded that since Gunter was a marginal employee, the company "would have been justified in replacing him in his position on that account". Nevertheless, the Trial Examiner and the Board found that Gunter was discharged because of his union activities.

The Trial Examiner discounted the objective nature of the July 13 memorandum from Mr. Hausz and the July 27 memorandum from Mr. Fabel to Mr. Singley because they were made so close to the time of Gunter's discharge. *Yet, there is no indication that at the time these memoranda were written, the employer had knowledge or any reason to know of Gunter's union activities.* The company did not become aware of the fact that Gunter was interested in the union until July 28, the day *after* Fabel's memorandum, and at that time, had notice only by Helms' statement that Gunter had attended a union meeting. Although the July 13 memorandum was not a "standard" method of making a complaint about an employee's performance, there is nothing to support the Trial Examiner's position that this and the July 27 memorandum were written only as a pretext for firing Gunter. On the other hand, they do support the company's position that Gunter's work continued to be unsatisfactory and that the poor work began to occur more frequently.

One might infer from the fact that Gunter was discharged only one day after the employer learned of his union activities that the discharge was unlawfully motivated, N. L. R. B. v. Camco, Inc., 5 Cir., 1966, 369 F.2d 125. However, other factors negate that inference. There is no substantial evidence of any general employer bias toward the union campaign. Although the company had been found guilty of an § 8(a) (1) violation in the past, there is no history of anti-union animus. Furthermore, Gunter was not a leader of the organizational

drive; rather, the facts indicate that he had attended a union meeting only a few times and showed no particular interest in the union's being formed. · The evidence of Gunter's poor work remains uncontradicted. Gunter was aware of his low ratings on the "Performance Reports", and that he failed to carry out his duties promptly. At the time of the discharge, Gunter was notified immediately that he was being discharged because of his poor work. There was apparently no animosity between the employer and Gunter at the time of his separation.

Although a discharge because of union activities is unlawful, the fact of union membership alone is no guaranty against discharge. Schwob Mfg. Co. v. N. L. R. B., 5 Cir., 1962, 297 F.2d 864. We have said that where "a man has given his employer just cause for his discharge, the Board cannot save him by showing that he was pro-union and his employer anti-union. * * * If an employee is both inefficient and engaged in union activities, that is a coincidence that does not destroy the just cause for his discharge", N. L. R. B. v. Birmingham Publishing Co., 5 Cir., 1959, 262 F. 2d 2, 9. A causal connection must be found between an act of discharge on the part of management and union activities or membership on the part of the employee, Schwob Mfg. Co. v. N. L. R. B., supra. That causal connection is not provided here by the isolated fact that Gunter was discharged shortly after the union activities became known to the company. This creates no more than a suspicion of unlawful discharge, which is unsupported by other facts and is contradicted by other circumstances surrounding this case. As this Court stated earlier:

"The Board's error is the frequent one in which the existence of the reasons stated by the employer as the basis for the discharge is evaluated in terms of its reasonableness. If the discharge was excessively harsh, if lesser forms of discipline would have been adequate, if the discharged employee was more, or just as, capable as the one left to do the job, or the like then, the argument runs, the employer must not actually have been motivated by managerial considerations, and (here a full 180 degree swing is made) the stated reason thus dissipated as pretense, nought remains but anti-union purpose as the explanation. But as we have so often said: management is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision. Management can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which § 8(a) (3) forbids." [Citations omitted].

N. L. R. B. v. McGahey, 5 Cir., 1958, 233 F.2d 406, 412–413.

With as much reason to discharge Gunter as existed here, it cannot be said that he would have been treated in a different manner had he had no connection with the union. It seems quite clear to us that Gunter's union activity was not the straw that broke the camel's back. "The power of reinstatement is remedial. It is not punitive. It is not to penalize an employer for anti-unionism by forcing on the payroll employees unfit to stay on the job". Frosty-Morn Meats, Inc. v. N. L. R. B., 5 Cir., 1961, 296 F.2d 617, 621. Taking the circumstances as a totality, we hold that there is no proof of a causal connection between the discharge and Gunter's slight union activity, and there is no substantial basis in the record to support the Board's position that the discharge was discriminatory and in violation of § 8(a) (3) and (1).

As to § 8(a) (1) charges involved in the conduct of Supervisor McKennon, enforcement granted.

In other respects, enforcement denied.