Franklin W. NIX and IAM Representatives Association, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 26788.

United States Court of Appeals
Fifth Circuit.

Nov. 19, 1969.

William M. Pate, Mitchell, Clarke, Pate & Anderson, Atlanta, Ga., for petitioners.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., Walter C. Phillips, Director, 10th Region, N. L. R. B., Atlanta, Ga., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Allison W. Brown, Jr., Marjorie S. Gofreed, Attys., N. L. R. B., for respondent.

Platon E. Papps, Bernard Dunau, Washington, D. C., Marjorie S. Gofreed, N. L. R. B., for intervenor.

Before RIVES, COLEMAN and MORGAN, Circuit Judges.

RIVES, Circuit Judge.

Petitioners Nix and the IAM Representatives Association (hereinafter the "Association") request this Court, pursuant to 29 U.S.C.A. § 160(f), to review an order of the National Labor Relations Board (hereinafter the "Board"). The employer before the Board is itself a labor organization, International Association of Machinists and Aerospace Workers, AFL–CIO (hereinafter IAM). IAM was charged with interference with organizational efforts of its own employees. The charges included refusal to

bargain with the union designated by its employees [§§ 8(a) (1) and 8(a) (5) of the National Labor Relations Act] and the discriminatory discharge of two of IAM's employees who were also representatives of the Association, Franklin W. Nix and William E. Sewell [§§ 8(a) (1) and 8(a) (3) of the National Labor Relations Act]. The Board found an 8(a) (5) refusal to bargain violation limited to the failure of the employer to produce certain requested information and records relevant to bargaining. The request for review does not involve this finding and order of the Board. The Board also found that the employer IAM had not violated the Act in discharging employees Nix and Sewell. This petition for review involves only the discharges of Nix and Sewell.

IAM is a large union with headquarters in Washington, D. C., and until September 1965 was divided into eight administrative territories with an elected vice-president heading each territory. IAM, also known as the Grand Lodge, employs about 230 Grand Lodge representatives, special representatives and press representatives who perform the usual functions of the union in the field —organizing, servicing local unions, handling grievances, negotiating contracts, etc. These field staff employees are under the direction of each regional vice-president and are required to be members of the IAM. Their duty is to promote and execute the policies of the union president and executive counsel at all times.

Nix had been employed since 1955 as a press representative in IAM's southern territory with headquarters in Atlanta. Sewell had been employed since 1954 as a Grand Lodge representative and was three times appointed acting vice-president of the southern territory. Both were interested and participated in organizing activities of the Association. Recognition of the Association by IAM was demanded by the field staff employees in July 1965, and in January 1966 a petition for representation in a nationwide unit was filed with the Board. Hearings were held, a nationwide unit was found appropriate and an election was directed. The Association received a majority of votes and was certified in August 1966 as the bargaining representative of IAM's field staff employees. Nix was elected secretary-treasurer of the Association and Sewell, Chairman of the negotiation committee.

The factual background of Nix's discharge is briefly outlined as follows. IAM vice-president Watkins arrived in Atlanta in July 1964, as officer in charge of the southern territory. Shortly after Watkins' arrival, Nix noticed a diary on Watkins' desk in which he kept a running account of activities in IAM, comments on his political status and other items related entirely to his personal life. Nix, and other employees at Nix's direction, began to copy items from the diary (by hand and by a photocopying device) with a view to bringing Watkins' deficiencies to the attention of other IAM officers. On July 9, 1965, at a meeting called at the request of Nix, Nix presented to IAM's resident vice-president Matthews and general secretary-treasurer DeMore a 48-page document containing Xeroxed and typed copies of Watkins' diary and stated that Watkins was unfit to administer the southern territory. Nix told the two officers that he had taken the information from Watkins' diary without his permission. At this same meeting, Nix announced the initiation of a campaign to organize the IAM staff representatives and noted that he was in charge of the campaign.

On July 12, 1965, DeMore and Matthews reported their conversation with Nix to IAM president P. L. Siemiller, and all three agreed that Nix's action with regard to Watkins' diary warranted discharge. Siemiller, however, in view of Nix's simultaneous organizational activities decided that no immediate action should be taken against him (or IAM would face an unfair labor practice charge). Siemiller had received a letter from Nix on July 10, 1965, informing Siemiller of the organizational activities

and warning that reprisals against Nix would be met by the filing of unfair labor practice charges.

On later occasions, the IAM Executive Council received a full report on Nix's charges against Watkins and the manner in which Nix had procured his material. On two separate occasions the IAM Council was unanimous in condemning Nix but adopted Siemiller's view that, due to Nix's organizing activities with the Association, it would not be advisable to discharge him at that time. Siemiller appointed a committee to investigate the charges against Watkins and disbanded the southern territory. On September 21, 1965, Sewell approached a member of this Committee and stated that, if Watkins were eliminated as vice-president, the Committee would then be in a position to make an agreement with the Association to end its organizing activities.

When the southern territory was disbanded, under instructions from president Siemiller, Nix remained at home awaiting an additional assignment. Although Nix remained on the payroll, he received no other work assignment during his remaining year of employment.

On January 6, 1966, the investigating committee issued a report exonerating Watkins of fraud or criminal misconduct. Also, on January 6, Nix at his own request met with Siemiller and two other IAM officers. Nix stated that he had lost interest in a staff union since he had achieved his main object of securing Watkins' removal from the southern territory and agreed to secure the dissolution of the Association if Siemiller would instead recognize an informal grievance committee. Siemiller declined Nix's offer. On January 11, Nix, directly contradicting these remarks, in a telegram to Siemiller claimed majority status of the Association and stated that a petition for certification had been filed with the Board. Nix also renewed

his demand for the removal of Watkins from office.

The Association filed an election petition for a nationwide unit and, after receiving a majority vote in the election, was certified in such unit on August 5, 1966. On August 31, Siemiller informed Nix that he was being discharged effective September 15. The reasons given for discharge were that the vice-president in charge of the territory where Nix was located had no assignments for press representatives and thus no need for Nix's services.

The Association petitions also for a review of Sewell's discharge. Sewell, employed by IAM as a Grand Lodge representative, joined the Association from its inception in July 1965, and his membership was known to IAM officials. As chairman of the negotiation and grievance committee of the Association, Sewell in a letter to Siemiller on December 5, 1966 requested a meeting to negotiate a contract. In addition, Sewell in his official capacity with the Association also requested information for use in bargaining. These requests were rejected in most respects by IAM.

The factual background of Sewell's discharge can be summarized as follows. Sewell received a reprimand from Siemiller on December 13, 1966, because of the brevity of his weekly reports, and was discharged on January 4, 1967, for refusing to carry out the IAM Executive Council's decision to secure elimination of IAM's post convention referendum.[1]

In October and November of 1966 the staff representatives of IAM (including Sewell) were informed of the necessity of eliminating the post-convention referendum and the support required of all staff representatives in working for its defeat. Siemiller, in a letter to Sewell on December 22, 1966, stated that he had received reports that Sewell was opposing the elimination of the referendum and requested him "to report to

---

1. Prior to January 1967, the IAM constitution required that a constitutional amendment approved by delegates to the International Convention be further submitted to a vote of the membership of each lodge.

this office if you have been advising local lodges to vote against the proposition in January; and if you have been opposing the [elimination of the] referendum, give reasons for such position." Sewell replied that he had not discussed the referendum with local lodges, but had done so with many individual members, urging that the referendum not be eliminated. On January 4, Siemiller discharged Sewell for actively supporting the referendum and thereby refusing to carry out the decision of the Executive Council.

The complaint before the Board alleged that, in its capacity as an employer, IAM discharged employees Nix and Sewell because of their membership in and activities on behalf of the Association. The Board, affirming the trial examiner's finding, held that Nix was discharged for pilfering documents from his superior at IAM and not because of his union membership and activity. International Ass'n of Machinists, 172 N. L.R.B. No. 239, 1968-2 CCH NLRB Dec. ¶ 20,187. A majority of the three-member panel, with the chairman dissenting, reversed the trial examiner's finding of discrimination with respect to Sewell. It found that Sewell was discharged for insubordination and not because of his union membership and activity. Therefore, the Board dismissed the complaint insofar as it alleged that IAM discriminatorily discharged Nix and Sewell in violation of sections 8(a) (1) and 8(a) (3) of the Act.

### Standards on Review

In reviewing the Board's findings and order, this Court must determine whether substantial evidence on the record as a whole supports the Board's finding that Nix and Sewell were not discharged for their union activities in violation of sections 8(a) (1) and 8(a) (3) of the Act. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 476, 95 L.Ed. 456 (1951). Ordinarily, the Board's choice between two fairly conflicting views will not be overturned by the courts. NLRB v. United Insurance Co., 390 U.S. 254, 260, 88 S.Ct. 988, 19 L. Ed.2d 1083 (1968). The Board's findings, however, will be rejected where they are not sufficiently supported by evidence, or when its inferences conflict with uncontradicted testimony or established facts. NLRB v. Fox Mfg. Co., 238 F.2d 211, 214 (5 Cir.1956); NLRB v. Coats & Clark, Inc., 231 F.2d 567, 572 (5 Cir.1956); see NLRB v. McGahey, 233 F.2d 406 (5 Cir.1956). If permissible inferences can be drawn either way, then the Board's conclusion that anti-union intent was not the motive for discharge cannot be displaced simply because a different conclusion is also arguable. As this Court has said, "the Board's choice between fairly competing inferences will be honored, even though we might draw a contrary inference on a consideration of the case de novo." NLRB v. Neuhoff Bros. Packers, Inc., 398 F.2d 640, 647 (5 Cir.1968).

That the employer in this case is a union and that the discharged individuals are employees of a union does not remove the case from the broad scope of the National Labor Relations Act. When a labor union assumes the role of an employer, the Act applies to its operations just as it would to any other employer. Office Employees' Intern. Union Local No. 11 v. NLRB, 353 U.S. 313, 316, 77 S.Ct. 799, 1 L.Ed.2d 846 (1957). Thus a union is subject to sections 8(a) (1) and 8(a) (3) of the Act as the employer of its staff representatives, and no valid basis exists for calculating on different scales whether or not a discharge is solely for cause and not because of union activities. See Federation of Union Representatives v. NLRB, 339 F.2d 126 (2 Cir.1964).

To constitute a violation of section 8(a) (3), "an improper motive must be a cause without which the employee would not have been discharged." NLRB v. Neuhoff Bros. Packers, Inc., supra at 647 of 398 F.2d. As to wheth-

er or not an unlawful motive can be inferred, this Court has stated:

"With discharge of employees a normal, lawful legitimate exercise of the prerogative of free management in a free society, the fact of discharge creates no presumption, nor does it furnish the inference that an illegal—not a proper—motive was its cause. An unlawful purpose is not lightly to be inferred. In the choice between lawful and unlawful motives, the record taken as a whole must present a substantial basis of believable evidence pointing toward the unlawful one."

NLRB v. McGahey, *supra* at 413 of 233. The record shows that Siemiller and other IAM officials were opposed to the Association from its inception.[2] However, as this Court has stated, anti-union bias is not in itself an unfair labor practice and "does not automatically make a discharge an unlawful one or, by supplying a possible motive, allow the Board, without more, to conclude that the act of discharge was illegally inspired." NLRB v. McGahey, *supra* at 409–410.

### Nix's Discharge

Petitioner Nix contends that a finding of unlawful discharge is demanded upon consideration of the substantial evidence on the record as a whole. His argument proceeds:

"The facts and evidence do not support the defense based on the Watkins episode. If that had been the real reason for the discharge, the employer would have had no reason to delay, but could have protected itself against a charge of discrimination by acting promptly when this cause for discharge first presented itself. The delay shows that there was another reason. The whole sequence of events, and the employer's strong hostility to the union, make it clear that the real reason was Nix's union activity. This conclusion is further supported by the fact that, when the employer did take discharge action, it found it necessary to assign a reason that was admittedly false. An innocent employer would not have found it necessary to delay the discharge or to lie about the reason."

The theft of Watkins' papers furnished ample grounds for discharge. NLRB v. Uniform Rental Service, Inc., 398 F.2d 812, 813 (6 Cir.1968); Brotherhood of Ry. & Steamship Clerks, Freight Handlers, Exp. and Station Emp. v. Atlantic Coast Line RR Co., 253 F.2d 753, 758 (4 Cir.1958); NLRB v. Clearwater Finishing Co., 203 F.2d 938, 939 (4 Cir.1953); see NLRB v. Big Three Welding Equip. Co., 359 F.2d 77, 83–84 (5 Cir.1966); NLRB v. Murray-Ohio Mfg. Co., 358 F.2d 948, 949–950 (6 Cir.1966). The issue presented is whether or not the reason assigned for discharge was pretextual, *i.e.* that the real motive for Nix's discharge was his activities with the Association.

In concluding that Nix had been discharged for pilfering, the Board adopted the trial examiner's analysis: "Viewing the discharge first as postured only in the light of the General Counsel's evidence a *prima facie* case was plainly made out that [IAM] acted discriminatorily," but IAM's "evidence was sufficient in preponderant weight to overcome the General Counsel's *prima facie* showing * * *" In contending that the evidence was not sufficient to overcome the *prima facie* showing of discrimination, Nix premises his argument on: (1) IAM's delay for over one year in firing him for misconduct; (2) IAM's erroneous statement of its reasons for discharge; (3) the irrebuttable evidence of IAM's anti-union motive.

The Board, adopting the trial examiner's findings, found that Nix "deliber-

---

2. In August 1965, Siemiller asked Sewell if he knew who had signed with the Association and stated that anyone who had anything to do with the Association "was a traitor to the Machinist's organization and there was no place for them on the force."

ately ties together his attack on Watkins and his organizational activities, advancing both simultaneously * * * to get the maximum possible protection from the latter against reprisals which he feared from the former." The record clearly shows that Nix first informed IAM of his activities with the Association at the same meeting at which he initially presented his evidence against Watkins. Several days later, Nix in a letter to IAM's president informed IAM of his activities with the Association and stated that any reprisals against him would result in the filing of unfair labor practice charges. The record also clearly shows that IAM considered Nix's pilfering of Watkins' private diary merited immediate discharge. Because Nix's activities with the Association were so closely connected to his charges against Watkins, IAM did not discharge Nix until one year later. The Board, in adopting the trial examiner's findings, explained IAM's dilemma:

"It was plain * * * [that Nix] deliberately tied together his attack on Watkins and his organizational activities, advancing both simultaneously. Whether his motives were purely political * * * or only partly so, it was apparent that Nix so entangled his attacks on Watkins with his organizational activities as to get the maximum possible protection from the latter against reprisals which he feared from the former. Furthermore, Nix's own testimony showed full recognition that his misconduct concerning the invasion of Watkins' personal papers and files was such as to warrant discharge. Thus he sought as a witness to explain his earlier failure to name his accomplices by testifying that *he wanted to protect them against discharge* and that he stood ready 'to take the rap.' As Nix was the principal, however, his conduct was obviously more blameworthy than that of his accomplices and more justifiable of discharge. Again in the January 6 meeting Nix's statements contained implicit recognition that his

discharge, based on taking documents from the Atlanta office, would be warranted.

"* * * [The IAM's] evidence showed that it was fully aware from the start that because of the coincidence of the organizing campaign and the attack on Watkins it could discharge Nix for his misconduct only at the price of involving itself in an unfair labor practice proceeding. Then and thenceforth the position which its International Officers consistently took and which its Executive Council concurred in was that Nix should be discharged because of his misconduct but that action should be postponed because of the almost certain risk of unfair labor practice charges as repeatedly threatened by Nix. Thus Nix had so ingeniously (and successfully) entangled his two activities, allegedly unconnected, that * * * [the IAM], though not the tortfeasor in this respect, could not itself safely attempt a disentanglement. * * *"

■ This Court has previously found an indication of discrimination in an employer's giving an employee one reason for discharge and then asserting a different reason before the Board. NLRB v. Bowman Transp., Inc., 314 F. 2d 497, 498 (5 Cir.1963). Proof of discrimination has been found in an employer's vacillation and assignment of a multiplicity of reasons for discharge, particularly against a background of union animus. NLRB v. Mid State Sportswear, Inc., 412 F.2d 537, 539 (5 Cir. 1969); NLRB v. Schill Steel Prods., Inc., 340 F.2d 568, 572–573 (5 Cir. 1965). Here the Board, adopting the trial examiner's findings, concluded that the "assigning of a different ground [than pilfering] in the discharge letter, though a suspicious circumstance, was not sufficient to tip the scales again to the General Counsel's side, particularly because, in * * * 2 months [IAM] pleaded in formal answer to the complaint that it discharged Nix because of his misconduct." As the Board has held in other cases, the assignment of erro-

neous reasons for discharge does not necessarily mean that the employee was in fact discriminatorily discharged but should be considered as only one element of the alleged discrimination. *E.g.,* Loffland Bros. Co., 166 N.L.R.B. No. 3 1967–CCH NLRB Dec. ¶ 21,585; Ralston Purina Co., 166 N.L.R.B. No. 46, 1967–CCH NLRB Dec. ¶ 21,616.

■ Petitioner Nix also contends that IAM was hostile to the Association. The fact that IAM was against the formation of the Association is clearly supported by the record taken as a whole. As has been stated, however, violation of 8(a) (1) or 8(a) (3) cannot be based solely on proof that an employee was active in the union and that the employer was opposed to the organization of its employees. NLRB v. McGahey, *supra* at 409 of 233 F.2d; NLRB v. Atkins Saw Division, 399 F.2d 907, 912 (5 Cir. 1968); NLRB v. Winn-Dixie Stores, Inc., 410 F.2d 1119, 1121 (5 Cir.1969). As this Court stated in *Atkins Saw Division,* "where 'a man has given his employer just cause for his discharge, the Board cannot save him by showing that he was pro-union and his employer anti-union.' " 399 F.2d at 912 quoting NLRB v. Birmingham Publishing Co., 262 F.2d 2, 9 (5 Cir.1959) [3]

### Sewell's Discharge

■■ The Board reversed the trial examiner's conclusion that Sewell had been discharged because of his union activity. It found that the General Counsel had not proved IAM's motive for Sewell's discharge was unlawful. Disagreement with the trial examiner was only as to inferences to be drawn from established facts and on the ultimate conclusion to be drawn. To differ with the trial examiner on inferences and conclusions to be drawn from the facts is the Board's prerogative. NLRB v. Miami Coca-Cola Bottling Co., 382 F.2d 921, 923 (5 Cir.1967); NLRB v. Dell, 283 F.2d 733, 735 (5 Cir.1960). The trial examiner's contrary conclusion, however, is a part of the record to be reviewed and should be considered in assessing the substantiality of the evidence supporting the Board's decision. Universal Camera Corp. v. NLRB, *supra;* NLRB v. Mid State Sportswear, Inc., *supra.* Moreover, the substantial evidence standard is not modified in any manner when the Board and trial examiner disagree. Halliburton Co. v. NLRB, 409 F.2d 496, 497 (5 Cir.1969). Where the Board reaches a different conclusion, if its findings are supported by substantial evidence on the record considered as a whole, they must be sustained. NLRB v. Mid State Sportswear, Inc., *supra* at 539.

The particular issue to be decided (having the Board's finding that the *prima facie* case of discrimination was overcome by the cause for discharge) is whether or not there is adequate support in the evidence for the Board's finding that Sewell was discharged because of his opposition to the proposed amendment; and even if he were so discharged, whether this reason removes his discharge from sections 8(a) (1) and 8(a) (3).

The Board found that IAM discharged Sewell because of his failure to support (and even opposition to) an amendment to the IAM constitution which would eliminate its post-convention referendum. The record clearly shows that Sewell had knowledge of the IAM's desire to have the amendment passed and its dependence upon Grand Lodge representatives (including Sewell) to support

**3.** If this Court should find that Nix was discriminatorily discharged, the question would arise whether Nix has forfeited reinstatement and backpay by his misconduct in pilfering Watkins' documents.

*See* NLRB v. Yazoo Valley Electric Power Ass'n, 405 F.2d 479, 480 (5 Cir. 1968); NLRB v. Big Three Indus. Gas & Equip. Co., 405 F.2d 1140, 1142 (5 Cir. 1969).

actively the amendment's passage among IAM members. With this knowledge, Sewell actively opposed the amendment.[4] For his opposition Sewell was discharged for insubordination.

A discharge for refusal to obey instructions does not violate sections 8(a) (3) and 8(a) (1). NLRB v. Camco, Inc., 369 F.2d 125, 128–129 (5 Cir. 1966); Frosty Morn Meats, Inc. v. NLRB, 296 F.2d 617, 619 (5 Cir.1961); NLRB v. Hudson Pulp & Paper Corp., 273 F.2d 660, 666 (5 Cir.1960). The duty of a Grand Lodge representative is to promote and execute the policy of IAM's Executive Counsel and the IAM president as their representatives. As a Grand Lodge representative, it was Sewell's obligation to support IAM's decision to support the amendment, regardless of Sewell's personal views. As the Board stated: "There is no evidence that [IAM] tolerated this bifurcating of a Grand Lodge Representative so that he could with impunity urge fellow members to vote one way, while as a paid employee he was under instructions to urge members to vote in a diametrically opposed way."

Petitioners contend that, even assuming Sewell was discharged because of his opposition to the amendment, his discharge still violates sections 8(a) (1) and 8(a) (3) for three reasons. They first contend that Sewell was exercising his membership rights *as a member of IAM* and cannot be discharged for exercising these rights. Under their contention, Sewell could oppose the amendment as an individual member of the IAM, even though as an employee of that union his duty was to support actively its passage. This contention seems to be without adequate foundation. Actual conflicts of interest arising from an individual's dual status as union member and employee may properly be resolved in favor of the employer's right to operate its business and to discharge employees for cause. *See* Retail Clerks Int'l Ass'n, A.F.L.-C.I.O. v. NLRB, 125 U.S.App.D.C. 63, 366 F.2d 642, 648 (1966); International Ladies' Garment Workers' Union, A.F.L.-C.I.O. v. NLRB, 339 F.2d 116, 123–124 (2 Cir.1964).

Petitioners also contend that Sewell's opposition to the amendment constituted concerted action safeguarded by section 7, 29 U.S.C.A. § 157, of the Act. This issue was not raised before the Board, and thus section 10(e), 29 U.S.C.A. § 160(e), of the Act precludes it from being raised before this Court. Marshall Field & Co. v. NLRB, 318 U.S. 253, 256, 63 S.Ct. 585, 87 L.Ed. 744 (1943); NLRB v. Millwrights & Machinery Erectors, Local Union 1510, 379 F.2d 679, 681 (5 Cir.1967); H. B. Zachry Co. v. NLRB, 377 F.2d 670, 671 (5 Cir.1967). The "issue was not raised below and cannot be raised for the first time on appeal." Pan-American Life Ins. Co. v. Alvarez, 374 F.2d 92, 94 (5 Cir.1967).[5]

The petitioners' third contention is that Sewell's insubordinate conduct was not the actual basis for his discharge but was a pretext to conceal his dismissal for activity in the Association. The Board found that "there is insufficient basis for inferring that the declared reason for discharging Sewell was a pretext

---

4. The Board rejected the contention that Sewell was not in fact insubordinate because he refrained from expressing his position at lodge meetings and limited his opposition to discussions with groups of individual IAM members.

5. Even assuming that this contention is properly before this Court, Sewell's ac-

tivity was not protected by section 7, for it squarely conflicted with the performance of his job obligation. *See* NLRB v. Local Union No. 1229, International Bhd. of Electrical Workers, 346 U.S. 464, 474–477, 74 S.Ct. 172, 98 L.Ed. 195 (1953); NLRB v. Washington Aluminum Co., 370 U.S. 9, 17, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962).

and that the real reason was his organizing activities." The fact that IAM was clearly opposed to the Association does not, without further evidence, establish an 8(a) (1) or an 8(a) (3) violation. As stated above in discussing Nix's discharge, anti-union bias is not in itself an unfair labor practice and "does not automatically make a discharge an unlawful one or, by supplying a possible motive, allow the Board without more, to conclude that the act of discharge was illegally inspired." NLRB v. McGahey, *supra* at 409–410 of 233 F.2d. "[A]n improper motive must be a cause without which the employee would not have been discharged." NLRB v. Neuhoff Bros. Packers, Inc., *supra* at 647 of 398 F.2d.

We hold that substantial evidence on the record considered as a whole supports the Board's finding that IAM's employees Nix and Sewell were discharged for cause and not because of their union membership and activity. Nix's discharge for pilfering his superior's personal papers and Sewell's discharge for disobeying instructions were legitimate grounds for discharge. The Board properly concluded that the General Counsel failed to sustain his burden of proof that the discharge of either Nix or Sewell was only a pretext to conceal dismissal for membership and activities in IAM's staff representatives' Association. The Board's finding that Nix and Sewell were discharged for legitimate reasons is a reasonable inference easily within the Board's power to draw. As recently stated by this Court, " 'the evidence of legitimate motive by the employer is sufficiently compelling that implications of illegality cannot control [these discharges] * * *.' " Trailmobile Division, Pullman, Inc. v. NLRB, 407 F.2d 1006, 1018 (5 Cir.1969), quoting NLRB v. Laney & Duke Storage Warehouse Co., 369 F.2d 859, 868 (5 Cir.1966). The petition for review is therefore

Denied.